AFFIRMED IN PART, AND VACATED AND REMANDED IN PART.

STATE OF MINNESOTA By Joseph N. ALEXANDER, its Commissioner of Natural Resources, Appellant,

and

Minnesota United Snowmobilers Association, Inc., et al., Intervenors-Appellants,

v.

John R. BLOCK,* individually and as Secretary of Agriculture of the United States, Appellee,

and

Sierra Club, et al., Intervenors-Appellees.

NATIONAL ASSOCIATION OF PROPERTY OWNERS, et al., Appellants,

and

State of Minnesota, by Joseph N. Alexander, its Commissioner of Natural Resources, Intervenor-Appellant,

v.

UNITED STATES of America; and John R. Block,* Secretary of Agriculture, individually and in his official capacity, Appellees,

and

Sierra Club, et al., Intervenors-Appellees.

NATIONAL ASSOCIATION OF PROPERTY OWNERS; Ely-Winton Boundary Waters Conservation Alliance; Range Actioneers, Inc.; Crane Lake Sportsmen's Club; and City of Winton, Appellants,

v.

John R. BLOCK,* individually and in his official capacity as Secretary of Agricul-

---

* Secretary of Agriculture Bob Bergland, originally named as a party, has been replaced by John R. Block, his successor in office. *See* Fed.R. App.P. 43(c)(1).

ture; and R. Max Peterson, individually and in his official capacity as Chief of the United States Forest Service, Appellees,

and

Sierra Club, et al., Intervenors-Appellees.

Nos. 80–1769, 80–1784, 80–1815, 80–1860, 80–1872, 81–1166, 81–1167, 81–1169, 81–1175 and 81–1168.

United States Court of Appeals, Eighth Circuit.

Submitted June 18, 1981.

Decided Sept. 30, 1981.

Warren Spannaus, Atty. Gen. of Minn., C. Paul Faraci, Deputy Atty. Gen., Philip J. Olfelt, Asst. Atty. Gen., St. Paul, Minn., Wayne H. Olson, Sp. Counsel, argued, Minneapolis, Minn., for State of Minn.

Brian B. O'Neill, argued, Faegre & Benson, Dayton, Herman, Graham & Getts, Minneapolis, Minn., for Sierra Club et al.

Sanford Sagalkin, Acting Asst. Atty. Gen., Washington, D. C., Thomas K. Berg,

U. S. Atty., Francis X. Hermann, Asst. U. S. Atty., Minneapolis, Minn., Edward J. Shawaker, James T. Draude, argued, Attys., Dept. of Justice, Washington, D. C., for appellee; James P. Perry, Dept. of Agriculture, Washington, D. C., James Pfeil, Dept. of Agriculture, Milwaukee, Wis., of counsel.

Dorsey, Windhorst, Hannaford, Whitney & Halladay, Edward J. Schwartzbauer, Eugene L. Johnson, Thomas E. Popovich, Minneapolis, Minn., for Lac La Croix Indian Band and Campbell's Cabins and Trading Post, Ltd.

Ben A. Wallis, San Antonio, Tex., Keith M. Brownell, Duluth, Minn., for National Ass'n of Property Owners.

Before LAY, Chief Judge, and BRIGHT and STEPHENSON, Circuit Judges.

BRIGHT, Circuit Judge.

These appeals arise from three consolidated cases involving multiple challenges to provisions of the Boundary Waters Canoe Area Wilderness Act of 1978, Pub.L.No. 95–495, 92 Stat. 1649 (BWCAW Act or the Act). On cross motions for summary judgment, the United States District Court for the District of Minnesota upheld all portions of the Act.[1] *National Association of Property Owners v. United States*, 499 F.Supp. 1223 (D.Minn.1980). In this opinion, we will consider separately two groups of appeals. In Case No. 1, appellants allege that Congress unconstitutionally applied federal controls on the use of motorboats and snowmobiles to land and waters not owned by the United States. In Case No. 2,

appellants assert that certain provisions of the legislation violate the Constitution and conflict with preexisting treaties and statutes.

*Case No. 1*

The State of Minnesota, joined by the National Association of Property Owners (NAPO) and numerous individuals, businesses, and organizations,[2] brought suit against the United States, challenging the constitutionality of the BWCAW Act as applied to lands and waters that the federal government does not own. A group of organizations concerned with the environmental and wilderness aspects of the boundary waters intervened in support of the United States.[3]

The challenged portion of the statute,[4] section 4, prohibits the use of motorboats in the BWCAW in all but a small number of lakes. The Act also limits snowmobiles to two routes. The United States owns ninety percent of the land within the borders of the BWCAW area. The State of Minnesota, in addition to owning most of the remaining ten percent of the land, owns the beds of all the lakes and rivers within the BWCAW.

Appellants assert that Congress had no power to enact the motor vehicle restriction as applied to nonfederal lands and waters. We reject this contention and conclude that Congress, in passing this legislation, acted within its authority under the property clause of the United States Constitution and that such action did not contravene the tenth amendment of the Constitution. Accordingly, we affirm.

1. Before the Honorable Miles W. Lord, now Chief Judge.

2. Most of these intervenors also participated in the separate actions considered in this opinion as Case No. 2. *See* n. 32 *infra*.

3. These groups include the Sierra Club; Friends of the Boundary Waters Wilderness; League of Women Voters of Minnesota; Izaak Walton League of America, Inc.; Minnesota Rovers; Wilderness Inquiry II; Minnesota Environmental Control Citizens' Association; Minneapolis, St. Paul, and Duluth Chapters of the National Audubon Society; Minnesota Ornithologists' Union; and the Wilderness Society (referred to collectively as Sierra Club).

4. In addition to the provisions challenged here, the Act, *inter alia*, prohibits mining, phases out timber harvesting, and expands the area an additional 45,000 acres. The Act also officially designates the area as the "Boundary Waters Canoe Area Wilderness (BWCAW)."

Section 5 of the Act provides that qualifying resort owners may force the federal government to buy their property and that the federal government then acquires the right of first refusal in certain designated property. These provisions will be considered in Case No. 2 *infra*.

## I. *Background.*

The Boundary Waters Canoe Area Wilderness (BWCAW), a part of the Superior National Forest, consists of approximately 1,075,000 acres of land and waterways along the Minnesota-Canadian border. A sponsor of this legislation described the area in introducing the BWCAW Act on the House floor:

The Boundary Waters Canoe Area is the largest wilderness area east of the Rocky Mountains and the second largest in our wilderness system. It is our Nation's only lakeland canoe wilderness—a network of more than 1,000 lakes linked by hundreds of miles of streams and short portages which served as the highway of fur traders who followed water routes pioneered by Sioux and Chippewa Indians. Despite extensive logging, the BWCA still contains 540,000 acres of virgin forests, by far the largest such area in the eastern United States.

This last remnant of the old "northwoods" is remarkable not only for its lakes and virgin forests, but also for its wildlife. * * * [M]any western wilderness areas lack such complete food chains. This natural ecosystem is a valuable educational and scientific resource; it has been the focal point of important research in wildlife behavior, forest ecology, nutrient cycles, lake systems, and vegetation history.

5. In 1909, President Theodore Roosevelt culminated seven years of federal reservation by proclaiming the one million-acre area as the Superior National Forest. Reservation and acquisition of additional lands continued through the century.

6. The boundary waters area has also been under international protection since early in the century. Canada and the United States negotiated the Root-Bryce Treaty of 1909, establishing joint regulation and limiting use of the waters along the international boundary. Also in 1909, the Province of Ontario set aside the Quetico Forest Reserve on the Canadian side of the border.

7. In 1926, the Secretary of Agriculture created the "Superior Wilderness Area" establishing a roadless area in one thousand square miles of the best canoe country. In 1930, Congress enacted the Shipstead-Nolan Act, 16 U.S.C. § 577

The BWCA is complemented on the Canadian side of our border by the Quetico Provincial Park of Ontario where commercial logging and nearly all motorized recreational activity are prohibited. Together, these areas encompass an area the size of Yellowstone National Park and constitute one of the finest wilderness areas on our continent. Not surprisingly, the BWCA is the most heavily used unit in the national wilderness system, drawing people from throughout the country who seek the solitude of a wilderness experience. [123 Cong.Rec. H621–22 (daily ed. Jan. 31, 1977), *reprinted in* Legislative History of the Boundary Waters Act of 1978, at 1–2.]

Beginning with the federal government's first reservation of forest land in 1902,[5] up to the present, both the United States and the State of Minnesota have sought to protect the boundary waters area.[6] Increasingly through the century, the governments have sought to preserve the primitive character of the area.[7] These efforts resulted in the designation of the boundary waters as part of the national wilderness system established under the Wilderness Act of 1964, *as amended*, 16 U.S.C. §§ 1131–36 (1976).

The Wilderness Act of 1964 prohibited use of motorized vehicles in any national wilderness area. That Act, however, provided a specific exception for the Boundary Waters Canoe Area:

*et seq.* (1976), to protect the natural features and forests of the area by prohibiting logging within 400 feet of any lake shore and restricting alteration of water or water levels. In 1933, Minnesota enacted similar legislation. In 1948, Congress passed the Thye-Blatnik Act, 16 U.S.C. § 577c (1976), authorizing the Secretary of Agriculture to acquire land to protect and enhance the wilderness canoe area. Minnesota consented to the federal acquisition of any land within the National Forest, subject to concurrent federal and state jurisdiction. *See* Minn. Stat. § 1.045 (West 1977). Also in 1948, the Forest Service designated the Superior, Little Indian Sioux, and Caribou Roadless Areas as needing special protection to preserve the recreational values afforded by the primitive character of the wilderness. In 1949, President Truman banned aircraft from the air space over the region.

Other provisions of this chapter to the contrary notwithstanding, the management of the Boundary Waters Canoe Area * * * shall be in accordance with regulations established by the Secretary of Agriculture in accordance with the general purpose of maintaining, without unnecessary restrictions on other uses, including that of timber, the primitive character of the area, particularly in the vicinity of lakes, streams, and portages: *Provided*, That nothing in this chapter shall preclude the continuance within the area of any already established use of motorboats. [16 U.S.C. § 1133(d)(5) (1976).] [8]

In response to the confusion and litigation generated by the proviso, as well as in reaction to threatened deterioration of the wilderness from excessive use, Congress enacted the Boundary Waters Canoe Area Wilderness Act of 1978. At issue here are portions of section 4 of the Act, the provision barring the use of motorized craft in all but designated portions of the wilderness.[9] Section 4(c) limits motorboat use to

8. Pursuant to this mandate, the Secretary of Agriculture issued a management plan for the area, establishing an Interior Zone free from logging activity and designating 19 motorized routes, covering 60 percent of the surface water. Minnesota likewise banned motor use except in those areas designated by the United States Secretary of Agriculture. In 1976, the United States Secretary of Agriculture banned all snowmobiling within the wilderness area.

9. Section 4 of the Act provides:
Sec. 4. (a) The Secretary shall administer the wilderness under the provisions of this Act, the Act of January 3, 1975 (88 Stat. 2096; 16 U.S.C. 1132 note), the Wilderness Act of 1964 (78 Stat. 890, 16 U.S.C. 1131–1136), and in accordance with other laws, rules and regulations generally applicable to areas designated as wilderness.
(b) Paragraph (5) of section 4(d) of the Wilderness Act of 1964 is hereby repealed and paragraphs (6), (7), and (8) of such section 4(d) are hereby redesignated as paragraphs (5), (6), and (7).
(c) Effective on January 1, 1979, the use of motorboats is prohibited within the wilderness designated by this Act, and that portion within the wilderness of all lakes which are partly within the wilderness, except for the following:
(1) On the following lakes, motorboats with motors of no greater than twenty-five horsepower shall be permitted: Fall, Lake County; Newton, Lake County; Moose, Lake County; Newfound, Lake County; Sucker, Lake County; Snowbank, Lake County; East Bearskin, Cook County; South Farm, Lake County; Trout, Saint Louis County; Basswood, except that portion generally north of the narrows at the north end of Jackfish Bay and north of a point on the international boundary between Ottawa Island and Washington Island; Saganaga, Cook County, except for that portion west of American Point; *Provided*: That, on the following lakes, until January 1, 1984, the horsepower limitations described in this paragraph shall not apply to towboats registered with the Secretary: Moose, Lake County; Newfound, Lake County; Sucker, Lake County; Saganaga, Cook County, as limited in this paragraph.
(2) On the following lakes and river, motorboats with motors no greater than ten horsepower shall be permitted: Clearwater, Cook County; North Fowl, Cook County; South Fowl, Cook County; Island River east of Lake Isabella, Lake County; Sea Gull, that portion generally east of Threemile Island, Cook County; Alder, Cook County; Canoe, Cook County.
(3) On the following lakes, or specified portions of lakes, motorboats with motors of no greater than ten horsepower shall be permitted until the dates specified: Basswood River to and including Crooked Lake, Saint Louis and Lake Counties, until January 1, 1984; Carp Lake, the Knife River, and Knife Lake, Lake County, until January 1, 1984; Sea Gull, Cook County, that portion generally west of Threemile Island, until January 1, 1999; Brule, Cook County, until January 1, 1994, or until the termination of operation of any resort adjacent to Brule Lake in operation as of 1977, whichever occurs first.
(4) On the following lakes, or specified portions of lakes, motorboats with motors of no greater than twenty-five horsepower shall be permitted until January 1, 1984: Birch, Lake County; Basswood, Lake County, that portion generally north of the narrows at the north end of Jackfish Bay and north of a point on the international boundary between Ottawa Island and Washington Island.
(d) The detailed legal description and map to be published pursuant to section 3 of this Act shall contain a description of the various areas where the motorized uses permitted by this section are located. No provision of this section shall be construed to limit mechanical portages or the horsepower of motors used on motorboats in the following areas within the wilderness:
Little Vermilion Lake, Saint Louis County; Loon River, Saint Louis County; Loon Lake, Saint Louis County; that portion of the Lac La Croix, Saint Louis County, south of Snow Bay and east of Wilkins Bay.

designated lakes and rivers, allowing a maximum of either ten or twenty-five horsepower motors on these waters. Section 4(g) permits certain limited mechanized portages. Section 4(e) restricts the use of snowmobiles to two designated trails.[10] With these exceptions, the Act as construed by the federal government and by the district court, prohibits all other motorized transportation on land and water falling within the external boundaries of the wilderness area.[11]

The boundaries of the BWCAW circum-scribe a total surface area of approximately 1,080,300 acres—920,000 acres of land and 160,000 of water. The United States owns approximately 792,000 acres of land surface, while the State of Minnesota owns approximately 121,000 acres of land,[12] in addition to the beds under the 160,000 acres of navigable water. *See National Association of Property Owners v. United States, supra,* 499 F.Supp. at 1253. Congress recognized that Minnesota would retain jurisdiction over the waters, but provided that the State could not regulate in a manner less stringent than that mandated by the Act.[13]

(e) For the purposes of this Act, a snowmobile is defined as any motorized vehicle which is designed to operate on snow or ice. The use of snowmobiles in the wilderness designated by this Act is not permitted except that the Secretary may permit snowmobiles, not exceeding forty inches in width, on (1) the overland portages from Crane Lake to Little Vermilion Lake in Canada, and from Sea Gull River along the eastern portion of Saganaga Lake to Canada, and (2) on the following routes until January 1, 1984:

Vermilion Lake portage to and including Trout Lake; Moose Lake to and including Saganaga Lake via Ensign, Vera and Knife Lakes, East Bearskin Lake to and including Pine Lake via Alder Lake and Canoe Lake. In addition to the routes listed above, the Secretary may issue special use permits for the grooming by snowmobiles of specified cross-country ski trails for day use near existing resorts.

(f) The Secretary is directed to develop and implement, as soon as practical, entry point quotas for use of motorboats within the wilderness portions of the lakes listed in subsection c, the quota levels to be based on such criteria as the size and configuration of each lake, and the amount of use on that lake: *Provided,* That the quota established for any one year shall not exceed the average actual annual motorboat use of the calendar years 1976, 1977, and 1978 for each lake, and shall take into account the fluctuation in use during different times of the year: *Provided further,* That on each lake homeowners and their guests and resort owners and their guests on that particular lake shall have access to that particular lake and their entry shall not be counted in determining such use.

(g) Nothing in this Act shall be deemed to require the termination of the existing operation of motor vehicles to assist in the transport of boats across the portages from Sucker Lake to Basswood Lake, from Fall Lake to Basswood Lake, and from Lake Vermilion to Trout Lake, during the period ending January 1, 1984. Following said date, unless the Secretary determines that there is no feasible nonmotorized means of transporting boats across the portages to reach the lakes previously served by the portages listed above, he shall terminate all such motorized use of each portage listed above.

(h) The motorized uses authorized by this section shall be confined to those types of snowmobiles, motorboats and vehicles which have been in regular use in the Boundary Waters Canoe Area prior to the date of enactment of this Act. The Secretary may set forth additional standards and criteria to further define the type of motorized craft which may be permitted.

(i) *Except for motorboats, snowmobiles, and mechanized portaging, as authorized and defined herein, no other motorized use of the wilderness shall be permitted.* Nothing in this Act shall prohibit the use of aircraft, motorboats, snowmobiles, or other mechanized uses in emergencies, or for the administration of the wilderness area by Federal, State, and local governmental officials or their deputies, only where the Secretary finds that such use is essential. [92 Stat. 1650–52 (emphasis added).]

Appellants specifically challenge subparagraphs (c), (e), (f), and (i).

**10.** The Act also permits snowmobiling on three other trails for up to five years.

**11.** In 1979, Ontario banned virtually all motor vehicles in Quetico Provincial Park.

**12.** Private parties own approximately 7,300 acres of land.

**13.** Specifically, § 15 provides:

The Secretary is authorized to promulgate and enforce regulations that limit or prohibit the use of motorized equipment on or relating to waters located within the wilderness in accordance with the provisions of this Act: *Provided,* That nothing in this Act shall be construed as affecting the jurisdiction or responsibilities of the State with respect to such waters except to the extent that the

Minnesota brought this action [14] against the United States on December 27, 1979, challenging the application of section 4 to land and waterways under state jurisdiction that fall within the boundaries of the BWCAW. The district court rejected the State's claim, holding that section 4, as applied to nonfederal property, constituted a valid exercise of Congress' legislative power under the property clause of the United States Constitution. *National Association of Property Owners v. United States, supra,* 499 F.Supp. at 1261.

On appeal, Minnesota and the intervening plaintiffs renew their assertions (1) that Congress acted in excess of its authority under the property clause by curtailing the use of motor-powered boats and other motorized vehicles on lands and waters not owned by the United States; and (2) that the tenth amendment of the United States Constitution bars the application of section 4 to "state-owned" lands and waters.[15]

## II. *Property Clause.*

The property clause provides: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States * * *." U.S.Const. art. IV, § 3, cl. 2. In a recent unanimous decision, the Supreme Court upheld an expansive reading of Congress' power under the property clause. *See Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976).[16] The Court concluded that

the Clause, in broad terms, gives Congress the power to determine what are "needful" rules "respecting" the public lands. * * * And while the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, we have repeatedly observed that "[t]he power over the public lands thus entrusted to Congress is without limitations." [*Id.* at 539, 96 S.Ct. at 2291.]

With this guidance, we must decide the question left open in *Kleppe*—the scope of Congress' property clause power as applied to activity occurring off federal land. Without defining the limits of the power, the Court in *Kleppe*, relying on its decision in *Camfield v. United States,* 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260 (1897), acknowl-

---

exercise of such jurisdiction is less stringent than the Secretary's regulations promulgated pursuant to this section * * *. [92 Stat. 1657.]

**14.** The district court consolidated this case with the two cases to be discussed in Case No. 2 of this opinion. *See infra.*

**15.** Minnesota also asserts that § 4 of the Act, when properly construed, does not apply to lands and waters under state jurisdiction within the boundaries of the BWCAW. Appellants' argument contradicts the plain language as well as the purpose and legislative history of the Act. Inasmuch as all navigable waters within the area fall under state jurisdiction, Congress' clear intent to ban motorboats from waters necessarily demonstrates an intent to ban them from state waters. The entire focus of the debate before Congress concerned which lakes would be designated motor-free. Section 2 specifically provides:

It is the purpose of this Act to

* * * * * *

(6) provide for the orderly and equitable transition from motorized recreational uses to nonmotorized recreational uses *on those lakes, streams, and portages in the wilderness where such mechanized uses are to be*

phased out under the provisions of this Act. [92 Stat. 1649 (emphasis added).]

In addition, the exemptions provided by § 4 of the Act make no sense unless Congress intended to ban motorized use on all nonexempt lakes. Finally, § 15 authorizes the Secretary to issue regulations "that limit or prohibit the use of motorized equipment on or relating to waters located within the wilderness * * *." Thus, we find this argument without merit.

**16.** Prior to *Kleppe*, language in Supreme Court opinions supported the argument that Congress' power over federally owned property did not exceed "the rights of an ordinary proprietor * * *." *Ft. Leavenworth R. R. Co. v. Lowe,* 114 U.S. 525, 527, 5 S.Ct. 995, 996, 29 L.Ed. 264 (1885) (dicta). *Accord, Paul v. United States,* 371 U.S. 245, 264, 83 S.Ct. 426, 437, 9 L.Ed.2d 292 (1963) (dicta). The Court in *Kleppe*, however, rejected any narrow construction of the property clause, holding that Congress possessed full legislative/police power over activity occurring *on federal property.* In other words, any conduct taking place on United States land may be subject to congressional authority, regardless of its relationship to that land. *Kleppe v. New Mexico, supra,* 426 U.S. at 540, 96 S.Ct. at 2292.

edged that "it is clear the regulations under the Property Clause may have some effect on private lands not otherwise under federal control." 426 U.S. at 546, 96 S.Ct. at 2295. In *Camfield*, the Court concluded that Congress possessed the power to control conduct occurring off federal property through its "power of legislating for the protection of the public lands, though it may thereby involve the exercise of what is ordinarily known as the police power, so long as such power is directed solely to [the public lands'] own protection." *Camfield v. United States, supra*, 167 U.S. at 526, 17 S.Ct. at 867.[17]

 Under this authority to protect public land, Congress' power must extend to regulation of conduct on or off the public land that would threaten the designated purpose of federal lands.[18] Congress clearly has the power to dedicate federal land for particular purposes. As a necessary incident of that power, Congress must have the ability to insure that these lands be protected against interference with their intended purposes. As the Supreme Court has stated, under the property clause "[Congress]

may sanction some uses and prohibit others, and *may forbid interference with such as are sanctioned." McKelvey v. United States*, 260 U.S. 353, 359, 43 S.Ct. 132, 135, 67 L.Ed. 301 (1922) (emphasis added).

This court has previously held that Congress, under the property clause, could prohibit hunting on waters within the boundaries of the Voyagers National Park in Minnesota, even though the waters were subject to state jurisdiction. *United States v. Brown*, 552 F.2d 817, 821 (8th Cir.), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). In *Brown*, the purpose of the challenged regulations extended beyond the mere protection of the federal land from physical harm. This court, in effect, affirmed the district court's approval of the regulations as necessary because "hunting on the waters in the park could 'significantly interfere with the *use of the park and the purposes for which it was established.' " Id.* at 822 (emphasis added).[19]

Having established that Congress may regulate conduct off federal land that interferes with the designated purpose of that

17. In *Camfield*, the Supreme Court upheld federal regulation of fences built on private land adjoining United States property.. These fences had the effect of enclosing the federal land and giving the private landowner sole use of public land.

18. Appellants' narrow and improper construction of the property clause would limit the reach of Congress' power to the particular factual situations approved in *Camfield* and *United States v. Alford*, 274 U.S. 264, 47 S.Ct. 597, 71 L.Ed. 1040 (1927) (protecting forests against dangers of fire occurring on federal land). *See also United States v. Lindsey*, 595 F.2d 5, 6 (9th Cir. 1979).

The case relied on by appellants, *Kansas v. Colorado*, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1906), has been greatly limited by the Supreme Court. In *Kleppe*, the Court wrote that *Kansas v. Colorado* "does no more than articulate the obvious: The Property Clause is a grant of power only over federal property. It gives no indication of the kind of 'authority' the Clause gives Congress over its property." *Kleppe v. New Mexico, supra*, 426 U.S. at 537–38, 96 S.Ct. at 2290–91.

The Court then cited *Camfield* with approval as establishing Congress' police power over nuisances occurring off federal land as long as it is directed to protecting the federal land. *Id.*

at 538, 96 S.Ct. at 2291. These cases, read together, establish that Congress has no plenary authority over conduct on nonfederal land, *Kansas v. Colorado, supra*; rather, Congress must demonstrate a nexus between the regulated conduct and the federal land, establishing that the regulations are necessary to protect federal property. *Camfield v. United States, supra.*

19. Two other district courts have affirmed Congress' power to regulate conduct on nonfederal land to further the purpose of federal lands. *United States v. Maki*, 5–78–2M (D.Minn.1978) (McNulty, Magis.) (approving Secretary of Agriculture's action banning snowmobiles in BWCA to promote wilderness purpose); *United States v. Hells Canyon Guide Service*, No. 79–743 (D.Ore. Nov. 14, 1979) (Juba, Magis.) (Secretary of Agriculture has power to regulate motorized use of Snake River, although water subject to state jurisdiction), *appeal docketed*, No. 80–3095 (9th Cir. Mar. 6, 1980). Relying on *United States v. Brown, supra*, the court in *Hells Canyon* concluded that "Congress' power over federal lands includes the authority to regulate activities on non-federal waters in order to protect the archaeological, ecological, historical and recreational values on the lands." Slip op. at 5.

land, we must determine whether Congress acted within this power in restricting the use of motorboats and other motor vehicles in the BWCAW. In reviewing the appropriateness of particular regulations, "we must remain mindful that, while courts must eventually pass upon them, determinations under the Property Clause are entrusted primarily to the judgment of Congress." *Kleppe v. New Mexico, supra,* 426 U.S. at 536, 96 S.Ct. at 2290. *Accord, United States v. San Francisco,* 310 U.S. 16, 29–30, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940); *United States v. Brown, supra,* 552 F.2d at 822. Thus, if Congress enacted the motorized use restrictions to protect the fundamental purpose for which the BWCAW had been reserved, and if the restrictions in section 4 reasonably relate to that end, we must conclude that Congress acted within its constitutional prerogative.

Congress passed the BWCAW Act with the clear intent of insuring that the area would remain as wilderness and could be

enjoyed as such.[20] Specifically concerning the motor use regulations, Congressman Fraser, in introducing the 1978 Act, stated:

The bill has four major thrusts. First, and most important, it seeks to end those activities that threaten the integrity of the BWCA's wilderness character by expressly prohibiting the following uses:

\* \* \* \* \* \*

Recreational uses of motorized watercraft and snowmobiles \* \* \*.

[123 Cong.Rec. H621 (daily ed. Jan. 31, 1977), *reprinted in* Legislative History of the Boundary Waters Act of 1978, at 1.]

Congress based its conclusions on certain statutory findings:

SECTION 1. The Congress finds that it is necessary and desirable to provide for the protection, enhancement, and preservation of the natural values of the lakes, waterways, and associated forested areas known (before the date of enactment of this Act) as the Boundary Waters Canoe Area, and for the orderly

---

**20.** Section 2 of the Act sets out congressional purposes:

> Sec. 2. It is the purpose of this Act to provide for such measures respecting the areas designated by this Act as the Boundary Waters Canoe Area Wilderness and Boundary Waters Canoe Area Mining Protection Area as will—
>
> (1) provide for the protection and management of the fish and wildlife of the wilderness so as to enhance public enjoyment and appreciation of the unique biotic resources of the region,
>
> (2) protect and enhance the natural values and environmental quality of the lakes, streams, shorelines and associated forest areas of the wilderness,
>
> (3) maintain high water quality in such areas,
>
> (4) minimize to the maximum extent possible, the environmental impacts associated with mineral development affecting such areas,
>
> (5) prevent further road and commercial development and restore natural conditions to existing temporary roads in the wilderness, and
>
> (6) provide for the orderly and equitable transition from motorized recreational uses to nonmotorized recreational uses on those lakes, streams, and portages in the wilderness where such mechanized uses are to be phased out under the provisions of this Act.
>
> [92 Stat. 1649.]

In addition, the BWCAW remains part of the National Wilderness Preservation System, and thus regulations affecting the BWCAW may also be said to advance the purposes of the Wilderness Act. 16 U.S.C. § 1131(a) states:

> (a) In order to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition, it is hereby declared to be the policy of the Congress to secure for the American people of present and future generations the benefits of an enduring resource of wilderness. For this purpose there is hereby established a National Wilderness Preservation System to be composed of federally owned areas designated by Congress as "wilderness areas", and these shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness; and no Federal lands shall be designated as "wilderness areas" except as provided for in this chapter or by a subsequent Act.

management of public use and enjoyment of that area as wilderness, and of certain contiguous lands and waters, while at the same time protecting the special qualities of the area as a natural forest-lakeland wilderness ecosystem of major esthetic, cultural, scientific, recreational and educational value to the Nation. [92 Stat. 1649.]

Hearings and other evidence provided ample support for Congress' finding that use of motorboats and snowmobiles must be limited in order to preserve the area as a wilderness. Testimony established that the sight, smell, and sound of motorized vehicles seriously marred the wilderness experience of canoeists, hikers, and skiers and threatened to destroy the integrity of the wilderness.[21]

As a result of considerable testimony and debate and a series of compromises, Congress enacted section 4 in an attempt to accommodate all interests, determining the extent of motorized use the area might tolerate without serious threat to its wilderness values.[22]

■ The motor use restrictions form only a small part of an elaborate system of regulation considered necessary to preserve the BWCAW as a wilderness.[23] The United States owns close to ninety percent of the land surrounding the waters at issue. Congress concluded that motorized vehicles significantly interfere with the use of the wilderness by canoeists, hikers, and skiers and that restricted motorized use would enhance and preserve the wilderness values of the area. From the evidence presented, Congress could rationally reach these conclusions. We hold, therefore, that Congress acted within its power under the Constitution to pass needful regulations respecting public lands.[24]

III. *Tenth Amendment.*

■ Appellants assert that application of the motorized use restrictions to land and waters under state jurisdiction violates the limitation on Congress' power imposed by the tenth amendment.[25] We hold that the amendment presents no such bar.

In *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.,* —— U.S. ——, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (hereinafter *Virginia Surface Mining*), the Supreme Court articulated the test to be applied to tenth amendment challenges brought under the rationale of *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).[26] The

---

21. Among other goals, Congress sought to control use to avoid threatened destruction caused by over-popularity of the wilderness area. As stated by Congressman Vento of Minnesota:
 It is amazing that this wilderness should be threatened by our enthusiasm to rush forward and to use it. * * * [T]o be threatened by the fact of overuse of recreation is indeed a sad irony. That overuse relates to canoeists and motorboat users. It relates to a variety of use. [124 Cong.Rec. H4944 (daily ed. June 5, 1978), *reprinted in* Legislative History of the Boundary Waters Act of 1978, at 119.]
 Congress, through the Act, has brought the regulation of the BWCAW in line with that of other wilderness areas, thus recognizing that historically the use of motor vehicles could not be reconciled with retaining a primitive wilderness area.

22. We find no merit in appellants' argument that Congress should have banned all motorized travel if it were serious about protecting the wilderness. Congress retains the freedom, as well as the obligation and ability, to balance competing interests. Courts should not lightly set aside the resulting compromises.

23. Other sections of the Act limit mining and timber activities and provide for limited visitor access to the wilderness.

24. Like the district court, we need not decide whether Congress could have enacted these regulations pursuant to its commerce clause or treaty making powers.

25. The tenth amendment of the United States Constitution provides:
 The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

26. Because we decide that the tenth amendment does not bar this legislation, we may assume, without deciding, that the limits imposed on the exercise of Congress' power under the commerce clause apply equally to exercises of power under the property clause, a question left open in *National League of Cities. See National League of Cities v. Usery, supra,* 426 U.S. at 852 n. 17, 96 S.Ct. at 2474 n. 17.

Court, in holding that environmental regulations of surface mining did not interfere with state police power, stated that a tenth amendment claim must satisfy three requirements:

First, there must be a showing that the challenged statute regulates the "States as States." Second, the federal regulation must address matters that are indisputably "attributes of state sovereignty." And, third, it must be apparent that the States' compliance with the federal law would directly impair their ability "to structure integral operations in areas of traditional functions." [*Hodel v. Virginia Surface Mining & Reclamation Association, Inc., supra,* 101 S.Ct. at 2366 (citations omitted).]

Appellants' challenge under the tenth amendment cannot be sustained. The restrictions on motorboats and snowmobiles do not regulate "States as States;" thus appellants' claim fails to satisfy the first requirement of the *Virginia Surface Mining* test.

The Supreme Court drew a sharp distinction

between congressional regulation of private persons and businesses "necessarily subject to the dual sovereignty of the government of the Nation and of the State in which they reside," and federal regulation "directed not to private citizens, but to the States as States[.]" As to the former, we found no Tenth Amendment impediment to congressional action. [*Id.* at 2365 (citations omitted).]

The restrictions at issue here regulate the activities of private individuals. In prohibiting motorized vehicles in the BWCAW, Congress acted to regulate private conduct

both on and off federal land, as necessary to protect that federal land.

The State argues that the motorized use restrictions interfere with its traditional role of regulating the waterways within the boundary waters.[27] The Supreme Court rejected a similar argument in *Virginia Surface Mining* and affirmed Congress' power under the commerce clause to displace the state's traditional police power of regulating land use. As the Court stated,

[a]lthough such congressional enactments obviously curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important, the Supremacy Clause permits no other result. [*Id.* at 2367.]

The Court concluded:

The Court long ago rejected the suggestion that Congress invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority under the Commerce Clause in a manner that displaces the States' exercise of their police powers. * * * It would therefore be a radical departure from long-established precedent for this Court to hold that the Tenth Amendment prohibits Congress from displacing state police power laws regulating private activity. [*Id.* at 2368.]

Appellants argue that the state "ownership" of the waters[28] distinguishes this case from the typical one. The state, however, does not "own" the water within its borders in the same manner as it owns the land under those waters. Rather, as an aspect of sovereignty, the state has the power to control the use of those waters for the benefit of the public.[29] This authority, like any other state police power, however, must yield to any valid exercise of federal power.

27. The Minnesota Supreme Court has long recognized the power of the federal government to displace state regulation of the boundary waters under Congress' commerce clause and treaty making powers. *See State v. Kuluvar,* 266 Minn. 408, 123 N.W.2d 699, 703 (1963).

28. A slightly different analysis may be required for regulation of conduct on state-owned land. However, even though the regulations might affect the state as a landowner, they remain essentially regulations of private conduct and not regulations of the state itself. To the ex-

tent they may be viewed as regulations of the state as state, appellants fail to show that the regulations would directly impair the state's ability to " 'structure integral operations in areas of traditional functions.' " *Id.* at 2366.

29. Referring to wildlife, long subject to state "ownership," the Ninth Circuit stated: "A state's control over its resources, including wildlife, does not prohibit the proper exercise of federal power under provisions such as the commerce clause." *United States v. Helsley,* 615 F.2d 784, 788 (9th Cir. 1979).

To a significant degree, Congress recognized and demonstrated its respect for state sovereignty throughout the Act.[30] Section 15, especially, permits the state to exercise its traditional jurisdiction over the waters as long as state regulation is not less strict than federal regulation.

We conclude that the statute withstands the *National League of Cities/Virginia Surface Mining* test. The restrictions on the use of motorboats and snowmobiles regulate only private conduct, and not the state itself. The state retains broad jurisdiction over conduct occurring on state lands and waterways. We conclude, therefore, that the tenth amendment presents no bar to these restrictions.

*Case No. 2*

In case two, we consider appeals from two consolidated lawsuits brought by the National Association of Property Owners (NAPO) against the United States and the Secretary of Agriculture.[31] NAPO was joined, in part, by a group of local individuals and organizations,[32] Campbell's Cabins and Trading Post, Ltd., and the Lac La Croix Indian Band, as well as the State of Minnesota as intervenor. The Sierra Club intervenors joined in support of the United States.[33]

The factual history of the Boundary Waters Canoe Area and the 1978 Act has been detailed in case one. The legal issues on appeal will be divided according to ap-

---

**30.** Sections 14, 15, and 16 of the Act provide:

 Sec. 14. Nothing in this Act shall be construed as affecting the jurisdiction or responsibilities of the State with respect to fish and wildlife in the wilderness and the mining protection area.

 Sec. 15. The Secretary is authorized to promulgate and enforce regulations that limit or prohibit the use of motorized equipment on or relating to waters located within the wilderness in accordance with the provisions of this Act: *Provided,* That nothing in this Act shall be construed as affecting the jurisdiction or responsibilities of the State with respect to such waters except to the extent that the exercise of such jurisdiction is less stringent than the Secretary's regulations promulgated pursuant to this section: *Provided further,* That any regulations adopted pursuant to this Act shall be complementary to, and not in derogation of regulations issued by the United States Coast Guard.

 The Secretary is authorized to enter into cooperative agreements with the State of Minnesota with respect to enforcement of Federal and State regulations affecting the wilderness and the mining protection area.

 Sec. 16. (a) The Secretary shall cooperate with the State of Minnesota and any political subdivision thereof in the administration of the mining protection area and in the administration and protection of lands within or adjacent to the mining protection area owned or controlled by the State or any political subdivision thereof. Nothing in this title shall deprive the State of Minnesota or any political subdivision thereof of its right to exercise civil and criminal jurisdiction within the wilderness and the mining protection area and impose land use controls and environmental health standards on non-Federal areas within the wilderness and the mining protection area, or of its right to tax persons,

corporations, franchises, or other non-Federal property, including mineral or other interests, in or on lands or waters within the wilderness and the mining protection area.

 (b) The Secretary is authorized to enter into cooperative agreements with the State of Minnesota with respect to enforcement of Federal and State regulations affecting the wilderness and the mining protection and shall consult with the State of Minnesota in an effort to enhance the multiple-use benefits to be derived from both State and national forest lands. [92 Stat. 1657–58.]

In addition, § 4(i) of the Act provides:

 * * * Nothing in this Act shall prohibit the use of aircraft, motorboats, snowmobiles, or other mechanized uses in emergencies, or for the administration of the wilderness area by Federal, State, and local governmental officials or their deputies, only where the Secretary finds that such use is essential. [92 Stat. 1652.]

**31.** NAPO also named the Chief of the United States Forest Service as a defendant in one of the cases.

**32.** The group to be referred to as "Local Appellants" includes the National Park Inholders Association; Ely-Winton Boundary Waters Conservation Alliance; Local 4757 United Steelworkers of America; Greater Virginia Area Chamber of Commerce; Crane Lake Commercial Club; Minnesota Arrowhead Association; Ely Chamber of Commerce; Carolyn M. Fisher; Border Lakes Association; Crane Lake Voyager Snowmobile Club, Inc.; Crane Lake Sportsmen's Club; Charlotte Ekroot, d/b/a Windigo Lodge; Range Actioneers, Inc.; and City of Winton.

**33.** *See* n. 3 *supra.*

pellants' three primary contentions. First, appellants allege that section 5 of the Act, which gives the United States a right of first refusal in certain property in the area, violates the takings clause and the due process clause of the fifth amendment. Second, appellants allege that, as applied to waters along the international border, the Act conflicts with two treaties between the United States and Canada, and that, by its own terms, the Act cannot be enforced. Third, appellants assert that the Act cannot be implemented until the Secretary of Agriculture files an environmental impact statement. We conclude that appellants' claims cannot be sustained, and, therefore, we affirm.

## I. *Section 5 Challenge.*

Under section 5[34] of the BWCAW Act the United States has specific obligations and rights concerning lands in or near the boundary waters. Section 5(a) provides that resort operators on designated lakes may require the federal government to purchase their resorts for the fair market value. Section 5(c) grants the United States the right of first refusal on all other property riparian to the lakes listed in section 5(a), once the United States has purchased a resort under the terms of that section.

■ NAPO, the Local Appellants, and the State of Minnesota appeal the district court's decision upholding section 5(c) of the Act. Specifically, the parties assert (1) that section 5(c) represents an unconstitutional taking of property without just compensation; (2) that section 5(c) constitutes an unconstitutional delegation of legislative authority to private citizens; and (3) that section 5(c) should be read to apply only to land within the external boundaries of the BWCAW.[35]

---

**34.** The full text of § 5 provides:

Sec. 5. (a) The owner of a resort in commercial operation during 1975, 1976 or 1977 and located on land riparian to any of the lakes listed below may require purchase of that resort, including land and buildings appurtenant thereto, by written notice to the Secretary prior to September 30, 1985. The value of such resort for purposes of such sale shall be based upon its fair market value as of July 1, 1978, or as of the date of said written notice, whichever is greater, without regard to restrictions imposed by this Act:

Fall, Lake County, Moose, Lake County, Snowbank, Lake County, Lake One, Lake County, Sawbill, Cook County, Brule, Cook County, East Bearskin, Cook County, Clearwater, Cook County, Saganaga, Cook County, Sea Gull, Cook County, McFarland, Cook County, North Fowl, Cook County, South Fowl, Cook County, Jasper Lake, Lake County, Ojibway, Lake County.

(b) An owner requiring purchase of a resort under this provision may elect to retain one or more appropriate buildings and lands not exceeding three acres, for personal use as a residence: *Provided,* That the purchase price to the Government for a resort shall be reduced by the fair market value of such buildings and lands, with the same valuation procedures outlined above.

(c) With respect to any privately owned lands and interests in lands riparian to the lakes listed above, and if the Federal Government has been required to purchase a resort on said lake, said lands shall not be sold without first being offered for sale to the Secretary who shall be given a period of one hundred days after the date of each such offer within which to purchase such lands. No such lands shall be sold at a price below the price at which they have been offered for sale to the Secretary, and if such lands are reoffered for sale they shall first be reoffered to the Secretary: *Provided,* That this right of first refusal shall not apply to a change in ownership of a property within an immediate family.

(d) There are authorized to be appropriated such sums as may be necessary for the acquisition of lands and interests therein as provided by this section. [92 Stat. 1652.]

**35.** We reject, with brief comment, a number of other issues raised by NAPO. NAPO first argues that § 5 is unconstitutionally vague because subparagraph (a) fails either to define "resort" or to provide notice to other landowners of the United States' purchase of resorts, and because subparagraph (c) does not specify a one hundred-day limit on responses to reoffers made to the federal government. Many statutes, however, require administrative and judicial construction to clarify specific language. Such statutes are not unconstitutionally vague. Further, no party to this proceeding has alleged any harm resulting from any possible vagueness.

Appellants also assert that § 5(a) is arbitrary because it provides a buy-out right to resort owners on only certain lakes. We cannot conclude, however, that Congress acted irrationally or arbitrarily in selecting the lakes it believed to be most seriously affected by the new Act. Neither is the Act suspect because Congress

## A. Fifth Amendment Taking.

Appellants assert that section 5(c), by establishing in the federal government a right of first refusal on designated property, constitutes a "taking" of property without just compensation. The Local Appellants claim that the statute in and of itself creates a cloud on the title of any property affected, and that the one hundred-day waiting period especially serves to diminish the value of the land by deterring potential buyers. Minnesota argues that the statute automatically creates an option in real property and, therefore, "takes" private property without compensation.

The Supreme Court recently reiterated its reluctance to rule on a challenge to the constitutionality of a statute on its face, particularly a claim alleging an unconstitutional taking of property. *Hodel v. Virginia Surface Mining and Reclamation Association*, —— U.S. ——, —— — ——, 101 S.Ct. 2352, 2369–70, 69 L.Ed.2d 1 (1981). The Court stated:

> "[T]his Court has generally 'been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.' Rather, it has examined the 'taking' question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action—that have particular sig-

nificance." *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979) (citations omitted).

These "ad hoc, factual inquiries" must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances. [*Id.* at 2370.]

Like the Court in *Virginia Surface Mining*, we have before us no challenges to the actual application of section 5(c) to particular parcels of land.[36] We may consider, therefore, only whether section 5(c) *on its face* constitutes an unconstitutional taking. Relying on the Supreme Court's opinion in *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), we conclude that it does not.

In *Allard*, plaintiffs challenged the Secretary of the Interior's interpretation of the Eagle Protection Act and the Migratory Bird Treaty Act, which applied the Acts' prohibitions to birds lawfully captured prior to the effective dates of the Acts. Specifically, the regulations at issue stated that birds, their parts, eggs, or nests lawfully acquired "may not be imported, exported, purchased, sold, traded, bartered, or offered for purchase, sale, trade or barter * * *." *Id.* at 54, 100 S.Ct. at 321. The Supreme Court recognized that this regulation could substantially affect the value of this property and its potential for profit, but concluded that compensation was not necessarily required. The Court held that "*the simple prohibition of the sale* of lawfully acquired property in this case does not effect

---

failed to include every business affected by the Act.

In addition, NAPO argues that § 3 of the Act, which defines the BWCAW with reference to a "September 1978" map, is unconstitutional because no such map existed at the time the Act became law. NAPO, however, cites no evidence to contradict the congressional reference to the map in both the Act and the legislative history, or to upset the district court's finding that Forest Service officials have had custody of the map since passage of the Act. NAPO does remain free to correct any alleged irregularities in the map published in the Federal Register.

Finally, we find no support in the record to substantiate NAPO's claim of extrajudicial bias on the part of Judge Lord.

**36.** Should any individual owner believe that, as applied to his particular parcel, § 5(c) constitutes an unconstitutional taking, he may bring suit for relief under the appropriate standards. *See generally Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979); *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

a taking," *id.* at 67–68, 100 S.Ct. at 328 (emphasis added), reasoning:

> The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather, a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety. [*Id.* at 65–66, 100 S.Ct. at 327.]

■ In our view, the mere conditioning of the sale of property, as done with section 5, similarly cannot rise to the level of a taking. Even if some diminution in value results from the passage of section 5(c), any affect on the landowner's aggregate property rights would be minimal. Section 5(c) does not interfere with the owner's use or enjoyment of his property; it does not compel the surrender of the land or any portion thereof; it does not affect the owner's ability to give his property or to transfer it in any manner to members of his immediate family. Section 5(c) may affect slightly an owner's ability to alienate property, but it has little effect on even that "strand" in the bundle of property rights.[37] We hold, therefore, that section 5(c), on its face, does not unlawfully take property in violation of the fifth amendment.[38]

### B. *Unconstitutional Delegation.*

■ NAPO and Minnesota assert that section 5(c) constitutes an unconstitutional delegation of legislative authority to a pri-

vate individual. They argue that, because the right of first refusal arises only after a resort owner demands that his land be purchased under section 5(a), Congress unlawfully delegated legislative power to resort owners. We reject this assertion.

The case law relied on by appellants does not support their position. In those cases, private individuals possessed the power to limit owners' use of their own property. For example, in *Eubank v. Richmond,* 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912), under the challenged ordinance, owners of two-thirds of the property in an area, at their discretion and without standards, could set the building line for the rest of the property in their area. The Court invalidated the regulation, because

> [o]ne set of owners determine[s] not only the extent of use but the kind of use which another set of owners may make of their property. * * * The statute and ordinance [confer] the power on some property holders to virtually control and dispose of the proper rights of others * * *. [*Id.* at 143, 33 S.Ct. at 77.][39]

Section 5 grants no power to one set of landowners to control either the extent or kind of use that others may make of their own property. Rather, Congress legitimately established a property regulation, the right of first refusal, and merely delayed its implementation until the occurrence of a contingency that Congress determined would make the regulation necessary. *See Currin v. Wallace,* 306 U.S. 1, 16, 59 S.Ct. 379, 387, 83 L.Ed. 441 (1939). Congress itself established the restrictions affecting the property and gave no one discretionary power over neighboring landowners. Resort owners may choose wheth-

---

**37.** In fact, we cannot conclude that the statute on its face necessarily will adversely affect the ability of landowners to sell their property. If the statute operates as intended, property owners will receive full value for their property either from the United States or a private purchaser.

**38.** Alternatively, the availability of an individual remedy for just compensation under the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491 (Supp. II 1978), may save the section from any alleged unconstitutionality. *See Union Carbide*

*Agricultural Products Co., Inc. v. Costle,* 632 F.2d 1014, 1018–19 (2d Cir. 1980), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981).

**39.** Similarly, in *State of Washington ex rel. Seattle Title Co. v. Roberge,* 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), the Supreme Court struck down an ordinance that gave property owners uncontrolled power to determine whether neighboring property could be used for a designated purpose.

er to require the government to buy them out, but this right relates only to the resort owners' property. We conclude, therefore, that Congress delegated no legislative power to private individuals.

### C. *Application to Lands External to the BWCAW.*

Minnesota asserts that section 5(c), when properly construed, should apply only to lands within the boundaries of the BWCAW. Such an interpretation, however, conflicts with plain language of the statute. Section 5(c) applies to *any* privately owned property on lakes listed in 5(a), making no distinction between land inside or outside of the BWCAW. Further, two of the lakes mentioned—Jasper Lake and Ojibway—lie entirely outside the BWCAW boundaries, so that their inclusion in section 5(c) necessarily implies that Congress intended the section to apply to lands outside the boundary waters area.

The State maintains that the plain language should be construed to apply to property only within the BWCAW because Congress provided no authorization to acquire land outside the boundary waters area. Minnesota argues that, because 5(c) contains no authorization to acquire lands, reference must be made to section 7(d)(1), which limits acquisition to land within the BWCAW. We believe, however, that section 5(c) when read with section 5(d), which authorizes funds to acquire lands as provided by section 5, grants independent authority to acquire property.[40] Thus, we conclude that section 5(c) applies to all lands riparian to the lakes listed in 5(a), whether inside or outside the boundaries of the BWCAW.

### II. *Canadian-United States Treaties.*

The Local Appellants assert that section 4 of the Act, limiting the use of snowmobiles and motorboats in the BWCAW, cannot be enforced on the waters along the international boundary because the restrictions conflict with two treaties between the United States and Canada, the Webster-Ashburton Treaty of 1842, 8 Stat. 572, and the Root-Bryce Treaty of 1909 (Boundary Waters Treaty), 36 Stat. 2448. The Lac La Croix Indian Band and Campbell's Cabins and Trading Post, Ltd., also raise the conflict between the motor use restrictions and the Root-Bryce Treaty.

Appellants assert that both Treaties, by guaranteeing that the border waterways remain "free and open," grant individuals the right to engage in commerce in those waters and that the limit on motorboat use interferes with this right by preventing individuals from engaging in commerce. They argue that the restrictions cannot be applied to the waters along the international boundary because section 17 of the Act[41] operates as a saving clause, in effect voiding any section of the Act that conflicts with any treaty. The district court held that the provisions of the BWCAW Act are consistent with both treaties.[42] *National Association of Property Owners v. United States, supra*, 499 F.Supp. at 1251, 1272. We agree.

### A. *The Webster-Ashburton Treaty.*

The Local Appellants assert rights arising from article II of the Webster-Ashburton Treaty:

> It being understood that all the water communications and all the usual portages along the line from Lake Superior to the Lake of the Woods, and also Grand Portage, from the shore of Lake Superior to the Pigeon River, as now actually used, shall be free and open to the use of the citizens and subjects of both countries. [8 Stat. 574.]

---

**40.** Section 5(d) provides:
> (d) There are authorized to be appropriated such sums as may be necessary for the acquisition of lands and interests therein as provided by this section. [92 Stat. 1652.]

**41.** Section 17 of the Act provides:
> Nothing in this Act shall affect the provisions of any treaty now applicable to lands

and waters which are included in the mining protection area and the wilderness. [92 Stat. 1658.]

**42.** Alternatively, the court held that, to the extent any conflict exists, the terms of the Act would control over those in the treaty. We need not pass on this conclusion.

■■■ This section, however, does not preclude the governments of both Canada and the United States from enacting reasonable regulations affecting commerce along the waterways, as long as the regulations apply equally to citizens of both countries. As the Assistant Secretary of State wrote in response to questions about the effect of the Treaty on the Act,

[w]e believe that the intent of the "free and open" provision for these waters was to ensure that this important route remained open, on an equal basis, to the nations of both countries. It would not be correct, however, to interpret "free and open" so broadly as to prohibit either United States or Canadian authorities from imposing any limitation upon the manner in which such waterways and portages may be used. In agreeing to free and open use of these waterways and portages, neither party intended to relinquish its sovereign role of imposing statutory limitations on behavior which would not be in the best interest of the respective country. [*National Association of Property Owners v. United States, supra,* 499 F.Supp. at 1234.][43]

Looking to the restrictions at issue, we conclude that they fall within the United States' retained sovereign power to regulate conduct on the waterways.

We are influenced by Canada's and the United States' determination of their powers under the Treaty. As the Supreme Court has explained, where ambiguities exist in a treaty "it is appropriate that we should look to the practical construction which has been placed upon it." *Pigeon*

*River Improvement, Slide and Boom Co. v. Charles W. Cox, Ltd.,* 291 U.S. 138, 158, 54 S.Ct. 361, 366, 78 L.Ed. 695 (1934).[44] By enacting section 17 of the Act along with section 4, Congress clearly indicated its belief that the Webster-Ashburton Treaty did not inhibit its power to preclude motor use along the international boundary.[45] Canada, as well, through the Province of Ontario, similarly banned motor use of the waterways along much of the border, indicating its view that the Treaty permits each party to evenhandedly restrict use of motorboats on their side of the border.

This practical interpretation, given by the parties to the Treaty, is a reasonable one. We conclude, therefore, that the Webster-Ashburton Treaty does not conflict with section 4 of the BWCAW Act.

B. *Root-Bryce Treaty.*

■■■ Appellants make a similar argument with respect to the Boundary Waters Treaty of 1909. Article I of the Root-Bryce Treaty provides:

The High Contracting Parties agree that the navigation of all navigable boundary waters shall forever continue free and open for the purposes of commerce to the inhabitants and to the ships, vessels, and boats of both countries equally, subject, however, to any laws and regulations of either country, within its own territory, not inconsistent with such privilege of free navigation and applying equally and without discrimination to the inhabitants, ships, vessels, and boats of both countries.[46] [36 Stat. 2449.]

Appellants argue that the Treaty, by guaranteeing that the waters "shall forever con-

---

43. Such executive interpretations of treaties are entitled to much weight. *See, e. g., Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961); *United States v. Conners,* 606 F.2d 269, 272 (10th Cir. 1979); *Dupree v. United States,* 559 F.2d 1151, 1155 (9th Cir. 1977).

44. In *Pigeon River,* the Supreme Court, in a limited opinion, held that the Webster-Ashburton Treaty did not

preclude an improvement which would make a stream along the boundary available for use theretofore impossible, or to prevent a reasonable and non-discriminatory charge for the use of such an improvement. In the terms of the treaty we find no compelling clarity of prohibition. [*Id.*]

45. By harmonizing the Act and the Treaty in this way, we may avoid finding that Congress impliedly abrogated this Treaty by enacting the BWCAW Act. *Cf. Torres v. Immigration and Naturalization Service,* 602 F.2d 190, 195 (7th Cir. 1979) (reconciling Selective Service Act with Spanish-American Friendship Treaty); *United States v. White,* 508 F.2d 453, 458 (8th Cir. 1974) (reconciling Indian Treaty with Bald Eagle Protection Act).

46. As the district court concluded, this section primarily insures that each sovereign may regulate conduct in the boundary waters as long as it acts in a nondiscriminatory manner. The motorboat restrictions unquestionably operate evenhandedly.

tinue free and open for the purposes of commerce * * *," provides an independent guarantee of free and open navigation, beyond insuring nondiscriminatory regulation. Assuming that such a guarantee exists, we nonetheless conclude that the motor use restrictions fall within Congress' retained power to regulate commerce along the boundary waters.

As with the Webster-Ashburton Treaty, Congress had the 1909 Treaty before it and enacted section 4 along with section 17, indicating its belief that the Act fell within its power to regulate commerce in a manner "not inconsistent with the privilege of free navigation" guaranteed by the Treaty. Ontario, as well, by banning motor use on its border waterways, indicated its interpretation of the 1909 Treaty as not prohibiting such regulation. We cannot find such a construction arbitrary or unreasonable.

The Treaty allows sovereign states the flexibility to reasonably regulate commerce along the international borders. Although neither may completely close down intercourse between the countries, each has a wide latitude in regulating conduct in the area. Construing the action of Congress in 1978 in harmony with the Treaty of 1909, we conclude that the motor use restrictions fell within the United States' power, retained under the Treaty, to pass regulations consistent with free navigation.

III. *Environmental Impact Statement.*

NAPO asserts that the district court erred in failing to enjoin the implementation of sections 4 and 5 until the Secretary of Agriculture files an Environmental Impact Statement (EIS) as required under section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C) (1976). The district court concluded that the Secretary need not file an EIS.

NAPO's argument rests on a basic misconception about the events necessary to trigger the requirements of NEPA. Section 102(2)(C) mandates that

all agencies of the Federal Government shall—

 * * * * * *

(C) include [an EIS] in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment * * *. [42 U.S.C. § 4332(2)(C).]

For an EIS to be required, some future federal action, on which an EIS may have some effect, must be anticipated. The motorboat restrictions, however, do not contemplate any such action. These regulations automatically went into effect on January 1, 1979, by force of the Act itself. The Secretary had no discretion or power to circumscribe, delay, or expand the motorboat restrictions. Because the Secretary has no discretion to act, no purpose can be served by requiring him to prepare an EIS, which is designed to insure that decisionmakers fully consider the environmental impact of a contemplated action. *See State of South Dakota v. Andrus,* 614 F.2d 1190, 1193 (8th Cir.), *cert. denied,* 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980). *See also Andrus v. Sierra Club,* 442 U.S. 347, 350, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943 (1979); *Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292, 1300 (8th Cir. 1976) *(en banc), cert. denied,* 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977).

NAPO, in reality, challenges the Act itself. The passage of an act of Congress, however, does not create an obligation to prepare an EIS, despite any significant environmental impact resulting from the legislation. NAPO would have the court impose an EIS requirement on Congress itself. Congress has not imposed such an obligation. We have no power to do so.[47]

Affirmed.

47. Although the pleadings are not clear, NAPO may also be claiming that an EIS is required under some sections, such as 4(e) (snowmobile restrictions) or 5(c) (option to purchase land), that grant the Secretary discretion in implementing the Act. To the extent that NAPO questions action under such sections, these challenges are not ripe for judicial consideration. The Secretary need not file an EIS until he makes a proposal or recommendation for federal action. *See Kleppe v. Sierra Club,* 427 U.S. 390, 406, 96 S.Ct. 2718, 2728, 49 L.Ed.2d

576 (1976). NAPO points to no such plan, but rather alleges that, potentially, the Secretary's exercise of his power under the Act would have a significant environmental impact. The mere possibility of such hypothetical, potential impact does not give rise to the EIS obligation. *See id.; BRS Land Investors v. United States,* 596 F.2d 353, 355 (9th Cir. 1979); *Lake Berryessa Tenants' Council v. United States,* 588 F.2d 267, 272 (9th Cir. 1978). Appellant, of course, remains free to challenge any future plans for federal action under the BWCAW Act if issued without an EIS.