# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

Nos. 07-3689/07-3696/08-1167
_____

| | | |
|---|---|---|
| Izaak Walton League of America, Inc., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| Wilderness Watch; Sierra Club | * | |
| Northstar Chapter; Northeastern | * | |
| Minnesotans for Wilderness, | * | |
| | * | |
| Plaintiffs - Appellants/ | * | |
| Cross-Appellees, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Abigail Kimbell, Chief of the United | * | |
| States Forest Service; Mike Johanns, | * | |
| Secretary of Agriculture, | * | |
| | * | |
| Defendants - Appellees, | * | |
| | * | |
| Conservationists With Common Sense; | * | |
| Cook County, a Political Subdivision | * | |
| of the State of Minnesota; Arrowhead | * | |
| Coalition for Multiple Use, | * | |
| | * | |
| Intervenors - Appellees/ | * | |
| Cross-Appellants, | * | |
| | * | |
| | * | |

Minnesota Department of Natural　　\*
Resources; Grand Portage Band of　　\*
the Minnesota Tribe,　　　　　　　　\*
　　　　　　　　　　　　　　　　　　\*
　　　　　　Amici on Behalf of　　　 \*
　　　　　　Appellees.　　　　　　　 \*

_____

Submitted: October 16, 2008
Filed: March 6, 2009

_____

Before LOKEN, Chief Judge, BYE and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Wilderness Watch, Sierra Club North Star Chapter, and Northeastern Minnesotans for Wilderness (collectively "Wilderness Watch") brought suit against Abigail Kimbell, Chief of the United States Forest Service, and Ed Schafer, Secretary of the United States Department of Agriculture (collectively "Forest Service"), alleging that the Forest Service's decision to construct a certain snowmobile trail between McFarland Lake and South Fowl Lake in northeastern Minnesota violated the Boundary Waters Canoe Area Wilderness (BWCAW) Act. Wilderness Watch based its challenge on Congress's inclusion of South Fowl Lake (and of North Fowl Lake, to which it is connected) in the "wilderness" under the BWCAW Act. According to Wilderness Watch, the BWCAW Act prohibits snowmobiling on the Fowl Lakes ("Count I") and requires the Forest Service to implement motorboat quotas on them ("Count II").

The district court[1] granted summary judgment to the Forest Service on Counts I and II, finding that the North and South Fowl Lakes are not "wilderness" under the BWCAW Act and therefore are not subject to snowmobiling and motorboat restrictions. But the district court also found that the environmental assessment (EA) prepared by the Forest Service for the plan to construct the snowmobile trail connecting the Fowl Lakes adjacent to the BWCAW failed to properly analyze the noise impact resulting from snowmobile use on the trail, as required by the National Environmental Policy Act (NEPA). As a result, the district court remanded to the Forest Service, instructing it to prepare an environmental impact statement (EIS) assessing the sound impact of the proposed trail routes on the adjoining wilderness area, and also enjoined the Forest Service from conducting any further activity on the proposed trail pending its completion of the EIS. Wilderness Watch appeals from the district court's grant of summary judgment to the Forest Service on Counts I and II, and Cook County, a political subdivision of the State of Minnesota, Conservationists with Common Sense, and Arrowhead Coalition for Multiple Use (collectively "Intervenors") appeal from the district court's NEPA ruling. For the reasons discussed below, we affirm.

## I. *Background*

The Wilderness Act of 1964, 16 U.S.C. §§ 1131–36, governs the process by which the President recommends, and Congress designates, wilderness areas and establishes requirements for the management of such areas. Section 1132 of the Act requires Congress to approve the creation of a wilderness area or the modification of a wilderness boundary. 16 U.S.C. § 1132(c), (e). The BWCAW Superior National Forest, Minnesota, was among the initial wilderness areas designated in the Act.

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

In 1978, Congress enacted the BWCAW Act

> to provide for the protection, enhancement, and preservation of the natural values of the lakes, waterways, and associated forested areas known…as the Boundary Waters Canoe Area, and for the orderly management of public use and enjoyment of that area as wilderness, and of certain contiguous lands and waters, while at the same time protecting the special qualities of the area as a natural forest-lakeland wilderness ecosystem of major esthetic, cultural, scientific, recreational and educational value to the Nation.

Pub. L. No. 95-495, § 1. Section 3 of the BWCAW Act, entitled "Boundary Waters Canoe Area Wilderness Designation and Map" states as follows:

> SEC. 3. The areas generally depicted as wilderness *on the map entitled "Boundary Waters Canoe Area Wilderness and Boundary Waters Canoe Area Mining Protection Area" dated September 1978* . . . comprising approximately one million and seventy-five thousand five hundred acres, *are hereby designated as the Boundary Waters Canoe Area Wilderness* (hereinafter referred to as the "wilderness"). Such designation shall supersede the designation of the Boundary Waters Canoe Area under section 3(a) of the Wilderness Act (78 Stat. 890) and *such map shall supersede the map on file pursuant to such section*. The map of the wilderness shall be on file and available for public inspection in the offices of the Supervisor of the Superior National Forest and of the Chief, United States Forest Service. The Secretary of Agriculture, hereinafter referred to as "The Secretary," shall, as soon as practicable but in no event later than one year after the date of enactment of this Act, *publish a detailed legal description and map showing the boundaries of the wilderness in the Federal Register*. Such map and description shall be filed with the Committee on Interior and Insular Affairs of the House of Representatives and the Committee on Energy and Natural Resources of the United States Senate. *Such map and description shall have the same force and effect as if included in this Act.* Correction of clerical and typographical errors in such legal description and map may be made.

Pub. L. No. 95-495, § 3 (emphasis added). Accordingly, § 3 "establishes the boundaries of the Wilderness by reference to the map Congress had before it" and "directs the Secretary to publish a legal description and more practical map in the Federal Register." *Nat'l Ass'n of Prop. Owners v. United States*, 499 F. Supp. 1223, 1240 (D. Minn. 1980). It "also authorizes the Secretary to make clerical and typographical corrections with regard to any errors in the description and the map." *Id*. Section 3 "does not delegate any authority to the Secretary; it merely directs the Secretary to publish a map of the boundaries already established by reference in the Act. Congress has determined the boundaries; the Secretary's only duty outlined in § 3 is to publish the map of boundaries." *Id*. at 1240–41. "Section 3 states that Congress had reference to a map—the map of September, 1978—when the Act was enacted; the Act denominates the areas on that map as the Boundary Waters Canoe Area Wilderness." *Id.* at 1231.

Section 4 of the BWCAW Act sets forth guidelines for the Act's implementation, providing, in relevant part:

> SEC. 4. (a) The Secretary *shall administer the wilderness under the provisions of this Act*, the Act of January 3, 1975 (88 Stat. 2096; 16 U.S.C. 1132 note), the Wilderness Act of 1964 (78 Stat. 890, 16 U.S.C. 1131-1136, and in accordance with other laws, rules and regulations generally applicable to areas designated as wilderness.

> \*\*\*

> (c) Effective on January 1, 1979 the use of motorboats is prohibited within the *wilderness designated by this Act*, and that *portion within the wilderness of all lakes which are partly within the wilderness*, except for the following:

> \*\*\*

> (2) On the following lakes and river, motorboats with motors no greater than ten horsepower shall be permitted: Clearwater, Cook County; *North*

*Fowl, Cook County*; *South Fowl, Cook County*; Island River east of Lake Isabella, Lake County; Sea Gull, that portion generally east of Threemile Island, Cook County; Alder, Cook County; Canoe, Cook County.

\*\*\*

(e) For the purposes of this Act, a snowmobile is defined as any motorized vehicle which is designed to operate on snow or ice. The use of snowmobiles in the wilderness designated by this Act is not permitted except that the Secretary may permit snowmobiles, not exceeding forty inches in width, on (1) the overland portages from Crane Lake to Little Vermilion Lake in Canada, from Sea Gull River along the eastern portion of Saganaga Lake to Canada, and (2) on the following routes until January 1, 1984:

Vermilion Lake portage to and including Trout Lake; Moose Lake to and including Saganaga Lake via Ensign, Vera and Knife Lakes, East Bearskin Lake to and including Pine Lake via Alder Lake and Canoe Lake.

\*\*\*

(f) *The Secretary is directed to develop and implement, as soon as practical, entry point quotas for use of motorboats within the wilderness portions of the lakes listed in subsection c*, the quota levels to be based on such criteria as the size and configuration of each lake, and the amount of use on that lake: Provided, That the quota established for any one year shall not exceed the average actual annual motorboat use of the calendar years 1976, 1977, and 1978 for each lake, and shall take into account the fluctuation in use during different times of the year: Provided further, That on each lake homeowners and their guests and resort owners and their guests on that particular lake shall have access to that particular lake and their entry shall not be counted in determining such use.

Pub. L. No. 95-495, § 4 (emphasis added).

On October 12, 1979, the Forest Service prepared the legal description and map as required by § 3 of the BWCAW Act. On February 29, 1980, the Forest Service published in the Federal Register a notice of the availability of the legal description and map. 45 Fed. Reg. 13490. On April 4, 1980, the Forest Service published the legal description of the wilderness boundaries and a map of the wilderness in 21 sheets in the Federal Register. 45 Fed. Reg. 23006. The legend on the map of the wilderness indicates that the BWCAW boundary is designated by black dots on top of a dark black line. On Sheet 10 of the map, the North and South Fowl Lakes are located to the right of the boundary line—thereby falling outside of the BWCAW boundary—and are shaded in orange to indicate that they are subject to a "10 Horsepower Limit."

The proposed South Fowl Snowmobile Trail ("South Fowl Trail") is at the center of this litigation. In 2003, the Forest Service identified an unlawful snowmobile route—Tilbury Trail—located in the Superior National Forest, which connected McFarland Lake in the west to South Fowl Lake. South Fowl Lake, along with North Fowl Lake, is the easternmost lake in a chain of lakes along the border between northeast Minnesota and Canada. The Forest Service closed Tilbury Trail because it encroached on Royal Lake and Royal River, located within the BWCAW along the northern edge of the trail. Following the trail's closure, the only available snowmobile access route to South Fowl Lake was Cook County Road 16, which required snowmobiles to share a steep and potentially dangerous road with cars and trucks. Seeking to develop a safe alternative route that would provide public snowmobile access to South Fowl Lake, the Forest Service proposed construction of South Fowl Trail, connecting McFarland Lake to South Fowl Lake along the same general route as Tilbury Trail.

Thereafter, the Forest Service began public discussions and field research on the proposed trail, culminating in a draft proposal for South Fowl Trail that identified several alternative snowmobile routes. In November 2005, the Forest Service released an EA for the proposed South Fowl Trail. The EA identified four potential trail routes

between McFarland Lake and South Fowl Lake. The second alternative trail route was the northernmost route of the proposed trails; it would involve the construction of 2.2 miles of new snowmobile trail, a segment of which would ascend to a bench along a steep ridge that is immediately adjacent to the BWCAW and that overlooks both Royal River and Royal Lake.

The EA considered the potential impact of each of the proposed alternatives on the surrounding area.[2] Relevant to this appeal, the EA considered the potential visual and sound impact resulting from each proposed trail. The EA found that the sound of snowmobile traffic from the second alternative route would carry directly into the adjoining wilderness and that intervening deciduous trees would do little to reduce the sound. While noting that sound measurements could be calculated at various locations within the wilderness, the EA stated that "such detailed data appears to be moot." Thus, because wilderness visitors would consider any sight or sound from snowmobiles to be negative, the EA dispensed with any quantitative measurements of the sound impact in the wilderness.

---

[2]The EA considered the impact on sensitive flora, the cumulative effects resulting from the construction of a new snowmobile trail, and the visual and sound impacts caused by snowmobile traffic. The EA determined that the potential impact of the second alternative trail on sensitive flora was not significant, based on an analysis of potential impacts on 85 sensitive species contained in the accompanying biological evaluation. The EA also analyzed potential cumulative effects of off-highway and off-season recreational use, as well as the potential for increased snowmobile traffic as a result of the new trail. The EA recognized the possibility of increased illegal recreational use resulting from the construction of a new snowmobile trail. But the EA noted that the project area is not a popular destination for off-highway vehicles and that the second alternative trail route was unlikely to result in additional incursions into adjoining wilderness because of the steep terrain separating the trail from the wilderness. The EA also evaluated the effectiveness of mitigation measures that would be employed to reduce off-highway and off-season recreational use.

Based on the analysis set forth in the EA, the Forest Service issued a Decision Notice (DN) and Finding of No Significant Impact (FONSI) on February 21, 2006, approving the selection of the second alternative trail for the South Fowl Trail. The Forest Service determined that a more complete analysis of the environmental effects in an EIS was unnecessary. The Forest Service concluded that construction of the South Fowl Trail along the second alternative route was not a "major Federal action[ ] significantly affecting the quality of the human environment" under NEPA. 42 U.S.C. § 4332(C). Regarding sound impact, the FONSI stated that the decibel level of a snowmobile in the adjoining wilderness, at a distance of 600 to 800 feet from the proposed route, would be approximately 49 decibels. The FONSI concluded that this decibel level was not significant.

Various environmental groups appealed the DN/FONSI. On May 18, 2006, a Forest Service Appeal Reviewing Officer recommended affirmance of the selection of the second alternative trail as set forth in the DN/FONSI. The Forest Supervisor subsequently adopted the recommendation.

Wilderness Watch filed suit against the Forest Service, alleging, inter alia: (1) that the Forest Service had allowed snowmobiles on South Fowl Lake in violation of the BWCAW Act ("Count I"); (2) that the Forest Service has failed to implement motorboat quotas on North and South Fowl Lakes in violation of § 4(f) of the BWCAW Act ("Count II"); and (3) that the Forest Service violated NEPA by failing to prepare an EIS for the proposed trail ("Count V").[3] The Forest Service did not

_____

[3]Counts III and IV are not at issue in this appeal. Count III alleged that, by authorizing a trail that will broadcast the sights and sounds of motorized use directly into wilderness, the trail violated the Forest Service's obligation under § 4(b) of the Wilderness Act to preserve the wilderness character of the BWCAW. Count IV alleged that the proposed trail did not conform to the mandatory protections for the threatened Canada lynx.

dispute that, since the enactment of the BWCAW Act in 1978, it had never refused to allow snowmobiles to use the Fowl Lakes or developed motorboat quotas for the Fowl Lakes. The Intervenors joined the litigation and opposed Wilderness Watch's claims. Wilderness Watch, the Forest Service, and the Intervenors filed cross-motions for summary judgment on each of Wilderness Watch's claims.

Because resolution of Wilderness Watch's claims turned, in part, on whether the Fowl Lakes were designated as wilderness area under the BWCAW Act, the district court issued a memorandum opinion resolving this threshold issue. The district court found that the Fowl Lakes were not located within the wilderness area prescribed under the BWCAW. In a subsequent opinion, the district court, inter alia, granted the Forest Services's motion for summary judgment on Counts I and II of the complaint but denied the motion as to Count V. The district court held that the Forest Service's decisions to construct a snowmobile trail connecting lakes adjacent to the BWCAW and not to set motorboat quotas on the Fowl Lakes were not arbitrary and capricious under the Wilderness Act and the BWCAW Act. But the district court found that the EA prepared by the Forest Service for the plan to construct the snowmobile trail connecting the Fowl Lakes adjacent to the BWCAW failed to properly analyze the noise impact resulting from snowmobile use on the trail, as required under NEPA. According to the court, the EA provided no quantitative evidence or analysis of decibel levels to be projected by the trail into the adjoining wilderness. Finding the decision to issue a FONSI arbitrary and capricious, the district court remanded the matter to the Forest Service, ordering it to "promptly prepare an EIS to evaluate more thoroughly the sound impact in the BWCAW, and to suspend further activity on the South Fowl Trail pending completion of the EIS."

II. *Discussion*

Both Wilderness Watch and the Intervenors appeal from the district court's judgment. First, Wilderness Watch argues that the district court erroneously granted the Forest Service summary judgment on Wilderness Watch's claims that the Forest

-10-

Service must administer the North and South Fowl Lakes as wilderness by implementing motorboat quotas for them and enforcing the snowmobile ban on them. According to Wilderness Watch, the only plausible reading of § 4 of the BWCAW Act is that Congress specifically included these lakes in the BWCAW and intended the motor-use restrictions specified in § 4 to apply to those lakes.

In response, the Forest Service and the Intervenors argue that Wilderness Watch's claims in Counts I and II of the complaint are barred by the six-year statute of limitations in 28 U.S.C. § 2401(a) because all of the harms of which Wilderness Watch complains are the result of Congress's exclusion of the Fowl Lakes from the BWCAW. This exclusion was evident no later than April 4, 1980, when the Forest Service published the maps and legal description showing the boundaries of the BWCAW in the Federal Register. Furthermore, the Forest Service and Intervenors point out that the Forest Service has never enforced a ban on snowmobiles on the Fowl Lakes, nor has it ever set motorboat quotas for these lakes. As a result, because the Forest Service's determination of the boundaries of the BWCAW and its treatment of the Fowl Lakes have been public knowledge for 30 years, Wilderness Watch's failure to bring suit in a timely manner means that this court must dismiss such claims. As to the merits, the Forest Service and the Intervenors assert that the map that Congress provided to the Forest Service when it passed the BWCAW Act plainly shows that the Fowl Lakes are outside of the BWCAW. The congressional map shows the Fowl Lakes as being subject only to the horsepower restrictions mentioned in § 4(c)(2) of the Act, and the Forest Service has consistently enforced those restrictions.

Second, as to Wilderness Watch's claim that the Forest Service violated NEPA, the Intervenors argue that the district court erroneously found that the issuance of a FONSI and the failure to complete an EIS were arbitrary and capricious regarding the consideration of the potential sound impact from the Fowl Lake project.

In response, the Forest Service and Wilderness Watch contend that this court lacks jurisdiction over the Intervenors' cross-appeal challenging the district court's NEPA ruling because only a federal agency can pursue an appeal of an order remanding a matter to an agency.

### A. *Statute of Limitations*

Before we can reach the merits of Wilderness Watch's claims, we must first determine whether such claims are barred by the statute of limitations.

Because neither the Wilderness Act nor the BWCAW Act create a private right of action, Wilderness Watch brought its claims under the Administrative Procedure Act (APA), 5 U.S.C. § 704. The statute of limitations set forth in 28 U.S.C. § 2401(a) therefore applies. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006) ("Neither the Stafford Act, NEPA, nor the statutes governing the Corps expressly provide for judicial review of the agency actions at issue. Therefore, jurisdiction is limited to judicial review under the APA, which provides for review of 'final agency action for which there is no other adequate remedy in a court.'" (quoting 5 U.S.C. § 704)); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 186 (4th Cir. 1999) (stating that because the APA does not include its own statute of limitations, the general statute of limitations set forth in § 2401(a) applies).

Section 2401(a) of 28 U.S.C. is a general statute of limitations for suits against the government, which provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." A "claim against [the] United States first accrues 'on the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'" *Chandler v. U.S. Air Force*, 255 F.3d 919, 921 (8th Cir. 2001) (quoting *Kinsey v. United States*, 852 F.2d 556, 557 (Fed. Cir. 1988)); *see also Victor Foods, Inc. v. Crossroads Econ. Dev. of St. Charles County, Inc.*, 977 F.2d 1224, 1226 (8th Cir. 1992) (per curiam) ("A cause of action accrues

when there are facts enabling one party to maintain an action against another."). Thus, a plaintiff's claim "accrues" for purposes of § 2401(a) when the plaintiff "either knew, or in the exercise of reasonable diligence should have known, that [he or she] had a claim." *Loudner v. United States*, 108 F.3d 896, 900 (8th Cir. 1997); *see also Stupak-Thrall v. Glickman*, 346 F.3d 579, 584 (6th Cir. 2003) ("This court has held that a right 'first accrues' when the plaintiff knows or has reason to know of the injury complained of.").

In the present case, the district court rejected the Forest Service's statute-of-limitations defense, stating that Wilderness Watch's claim was not time-barred by the six-year statute of limitations in § 2401(a) "to the extent [Wilderness Watch] argue[s] that the USFS's failure to implement motorboat quotas is a continuing violation." "Under the so-called continuing-violation theory, each overt act that is part of the violation and that injures the plaintiff starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Midwestern Mach. Co. v. Northwest Airlines*, 392 F.3d 265, 269 (8th Cir. 2004) (internal quotations, alterations, and citations omitted). "[A]cts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations." *Id.* at 270 (internal quotations and citations omitted). Thus, to apply the continuing violation theory, "new overt acts must be more than the unabated inertial consequences of the initial violation." *Id.*

We have not addressed application of § 2401(a) in relation to a continuing violation theory. The Sixth Circuit has done so and rejected the application of the continuing violation theory in a similar case. *Stupak-Thrall*, 346 F.3d at 584–85. In *Stupak-Thrall*, property owners holding certain riparian rights to the use of a lake located in a national forest sought a declaration that the lake was not part of the federal wilderness area and therefore was not within the regulatory authority of the Forest Service. *Id.* at 581. Congress had enacted the Michigan Wilderness Act (MWA) in 1987, thereby creating the wilderness area. *Id.* This area fell under the rule-making

-13-

authority of the Forest Service, which began the process of amending the management plan to include regulation of the wilderness area. *Id.* On April 20, 1992, the Forest Service announced an amendment to the management plan, which dramatically restricted certain activities on the portion of the lake lying within the wilderness area. *Id.* Thereafter, in 1995, the Forest Service adopted another amendment, imposing more restrictions on the portion of the lake lying within the wilderness area. *Id.* In May 1998, the property owners filed suit, seeking a declaration that the lake was not part of the wilderness area. *Id.* at 584. The district court determined that the property owners' claim "first accrued" when the MWA was passed, as Congress specifically designated a certain area, as referenced on a map, as the wilderness area. *Id.* The map included about 95% of the lake at issue. *Id.* "Ultimately, the district court decided that the latest possible accrual date was April 20, 1992, when [the first amendment] was issued." *Id.*

"On appeal, in an apparent attempt to avoid a problem with the statute of limitations," the property owners argued that the lake was not part of the wilderness and that the Forest Service failed to complete the official map and legal description of the wilderness area as required by the MWA. *Id.* at 582. The property owners maintained "that the cause of action contesting the inclusion of the lake within the wilderness area did not accrue until the spring of 1998, when they learned that the Forest Service had not yet issued the official map of [the wilderness], as required by the MWA." *Id.* at 584. According to the property owners, "they could not have been on notice that the lake was part of the wilderness because the official map, which would provide them with that information, had yet to be published." *Id.* The court rejected this argument, finding that the property owners "fail[ed] to make any meaningful connection [ ] between the Forest Service's failure to file a map, and the lake's inclusion in the Wilderness Area," as the MWA did not "predicate [the] existence of the Wilderness Area on the promulgation of a map. Rather, it impose[d] a duty to complete a map as soon as practicable." *Id.*

-14-

The court agreed with the district court that the latest possible accrual date was April 20, 1992, when the amendment was issued, stating, "This amendment was issued under the standard rule-making procedure, including public notice and a public comment period. Accordingly, the plaintiffs were on notice that the federal government claimed jurisdiction over the lake at the time the Forest Service issued Amendment No. 1." *Id.* Because the property owners did not file their complaint for declaratory relief until May 1998, the court held that the action was time-barred by the six-year statute of limitations set forth in § 2401(a). Furthermore, the court concluded that "[e]ven if the accrual date might somehow be tied to the issuance of the map," the property owners' claim was still time-barred because they

> were clearly aware of the Forest Service's promulgation of Amendment No. 1, and of the Forest Service's intention to exercise dominion over the lake by promulgating that amendment. The plaintiffs were likewise on notice, through the MWA and the public notice and comment period, that a map was to be filed and that the Forest Service intended to include the lake in any officially issued version of the Wilderness Area map.

*Id.* at 584–85.

Other circuits have also declined to apply the continuing violation analysis in similar contexts. *See, e.g.*, *Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299 (Fed. Cir. 2008) (holding that statute of limitations on county political party chairman's suit against Secretary of Veterans Affairs, which alleged that regulation prohibiting demonstrations by visitors to Department of Veterans Affairs (VA) property was unconstitutional, accrued at time of final agency action, which was at the time the regulation was last amended; notwithstanding contention that VA failure to engage in notice and comment rulemaking was continual, the regulation was in full force and effect and was operative at time of amendment, thus commencing statute of limitations); *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006) (holding that the failure of the Secretary of the Department of the Interior to

perform the nondiscretionary duty to designate a critical habitat for a threatened species, as required by the Endangered Species Act, was not a continuing violation that permitted extension of the applicable six-year limitations period for filing suit against the government; the Act created a fixed point in time at which the violation for the failure of the Secretary to designate a critical habitat arose, a reasonably prudent plaintiff would have been aware of the failure of the Secretary to designate on the day following the deadline for the designation, the six-year limitations period for filing suit against the government was required to be strictly construed, and plaintiff had alternative remedy to petition the Secretary to designate a critical habitat or adopt a special rule to provide for conservation of a species).

We are persuaded by the rationale set forth in *Stupak-Thrall*, as well as in *Preminger* and *Hamilton*. Accordingly, we hold that the continuing violation doctrine does not apply. Wilderness Watch's claims that the Forest Service (1) violated the BWCAW Act by permitting snowmobiles on South Fowl Lake and (2) failed to implement motorboat quotas on North and South Fowl Lakes in violation of § 4(f) of the BWCAW Act are time-barred by the six-year statute of limitations.

Wilderness Watch's claims accrued no later than April 4, 1980, when the Forest Service published in the Federal Register the legal description and maps for the BWCAW. Our review of the relevant Forest Service map shows that the North and South Fowl Lakes are located to the right of the dark black boundary line—thereby falling outside of the BWCAW boundary.[4] "[T]he appearance of regulations in the Federal Register g[ives] legal notice of their content to all affected thereby." *United States v. Wiley's Cove Ranch*, 295 F.2d 436, 447 (8th Cir. 1961).

---

[4]Because we hold that Wilderness Watch's claims are time-barred, we decline to address whether the North and South Fowl Lakes are actually "wilderness" under the BWCAW Act. Instead, we only find that the Forest Service has consistently and conclusively treated the Fowl Lakes as falling outside of the BWCAW boundary.

Furthermore, even if the Forest Service map were unclear as to the boundary line of the BWCAW, Wilderness Watch has known since the passage of the BWCAW in 1978 that the Forest Service was not treating North and South Fowl Lakes as "wilderness" because, both before and after the passage of the BWCAW Act, it allowed snowmobiling on the Fowl Lakes and never implemented motorboat quotas on the lakes. In fact, Wilderness Watch concedes in its reply brief that the Forest Service "has not enforced, and still is not enforcing, the snowmobiling ban or motorboat quotas on the Fowl Lakes."

Finally, the Forest Service's map showing that the Fowl Lakes are subject to horsepower restrictions and the Forest Service's enforcement of the horsepower restrictions on the Fowl Lakes pursuant to § 4 of the BWCAW Act does not undermine its position that those lakes are not a part of the wilderness. This court has previously acknowledged the enforcement of horsepower restrictions on adjacent non-wilderness land. Congress can insulate the wilderness by imposing restrictions on lakes very close to the wilderness area "to insure that these lands be protected against interference with their intended purposes." *Minnesota v. Block*, 660 F.2d 1240, 1249 (8th Cir. 1981) (holding Congress has the power under the Property Clause of Article IV of the Constitution to regulate "conduct on or off the public land that would threaten the designated purpose of federal land").[5]

---

[5]In its motion for summary judgment on Count II of Wilderness Watch's complaint, the Intervenors argued that the Forest Service is not required to establish motorboat quotas on North and South Fowl Lakes under the BWCAW Act because the Act only applies to those areas designated as wilderness under the Act. Additionally, the Intervenors maintained that Congress improperly imposed motorboat regulations on North and South Fowl Lakes under the BWCAW Act in violation of the Property Clause because the Fowl Lakes are not "wilderness." We need not address these arguments on appeal because we hold that Wilderness Watch's claim that the Forest Service failed to implement motorboat quotas on North and South Fowl Lakes in violation of § 4(f) of the BWCAW Act is time-barred by the six-year statute of limitations.

Therefore, as in *Stupak-Thrall*, Wilderness Watch was on notice that the Forest Service did not consider the North and South Fowl Lakes as a part of the BWCAW at the time that the Forest Service issued the legal description and maps for the BWCAW. It was clearly aware, as evidenced in its reply brief, that the Forest Service never treated the North and South Fowl Lakes as a part of the BWCAW. The Forest Service has never exercised its dominion over the Fowl Lakes, as it continued to allow snowmobiling and declined to institute motorboat quotas even after the BWCAW Act's passage. Because the latest possible accrual date is April 4, 1980, and because Wilderness Watch did not file the instant action until August 17, 2006, its claims are time-barred.

## B. *NEPA Ruling*

We next address whether we have jurisdiction over the Intervenors' cross-appeal challenging the district court's NEPA ruling.

"Under 28 U.S.C. § 1291 this court has appellate jurisdiction only if an order of the district court is a 'final decision.' A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Giordano v. Roudebush*, 565 F.2d 1015, 1017 (8th Cir. 1977) (internal quotations and citations omitted). "[N]umerous cases have held that an order remanding to a federal agency for further proceedings is not a final order within the meaning of § 1291." *Borntrager v. Cent. States, Southeast, & Southwest Areas Pension Fund*, 425 F.3d 1087, 1091 (8th Cir. 2005) (citing *Giordano*, 565 F.2d at 1017 and cases cited therein); *see also Occidental Petroleum Corp. v. S.E.C.*, 873 F.2d 325, 329 (D.C. Cir. 1989) ("The Supreme Court has apparently never addressed the issue of whether an order remanding a case for further proceedings before an administrative agency is 'final' within the meaning of § 1291, nor has it had occasion to decide whether the collateral order exception has any application to such an order. The courts of appeals that have considered the question, however, have uniformly held

-18-

that, as a general rule, a remand order is 'interlocutory' rather than 'final,' and thus may not be appealed immediately (unless, of course, it is certified pursuant to § 1292).").

Here, in its NEPA ruling, the district court remanded the case to the Forest Service, instructing it to "prepare an [EIS] assessing the sound impact of each of the proposed South Fowl Trail routes on the adjoining wilderness area," but also "enjoined [the Forest Service] from conducting any further activity on the proposed trail pending completion of the EIS." Therefore, the district court both remanded the matter to the agency for further proceedings *and* granted injunctive relief. As to the remand order, we find no circumstances warranting a less restrictive application of the final judgment rule and therefore hold that we lack jurisdiction over the Intervenors' appeal of the remand order.

The collateral order doctrine or a similar administrative law exception to the final judgment rule may well apply when an agency seeks to appeal a remand order to raise an issue that could not be appealed after the proceedings on remand. *See Davies v.* Johanns, 477 F.3d 968, 971 (8th Cir. 2007); *Alsea Valley Alliance v. Dept. of Commerce*, 358 F.3d 1181, 1184 (9th Cir. 2004); *Occidental*, 873 F.2d at 329; *United States v. Alcon Labs.*, 636 F.2d 876, 884–85 (1st Cir. 1981); *Cohen v. Perales*, 412 F.2d 44, 48 (5th Cir. 1969); *Bender v. Clark*, 744 F.2d 1424, 1428 (10th Cir. 1984); *Huie v. Bowen*, 788 F.2d 698, 703 (11th Cir. 1986). This principle might apply, for example, if the Forest Service had appealed to argue that it should be permitted to consider whether a modified EA and FONSI would be sufficient, rather than a more costly and time-consuming EIS. But no such issue is raised here.

We do have jurisdiction under 28 U.S.C. § 1292(a) to consider the district court's grant of an injunction suspending work on the South Fowl Trail pending completion of an EIS. But the Forest Service has not appealed the injunction. Even if the district court had not granted this relief, or if this court now vacated the injunction, the Forest Service would have authority to halt further activity on the proposed trail

-19-

pending its completion of an EIS. At oral argument, the Forest Service advised that its normal practice is to halt activity pending further review. In these circumstances, Intervenors may not obtain relief from the preliminary injunction because they are not being irreparably injured by it. The district court of course retains jurisdiction to modify the injunction if circumstances change before completion of the proceedings on remand.

## III. *Conclusion*

Accordingly, we hold that Wilderness Watch's claims that the Forest Service (1) violated the BWCAW Act by permitting snowmobiles on South Fowl Lake and (2) failed to implement motorboat quotas on North and South Fowl Lakes in violation of § 4(f) of the BWCAW Act are time-barred by the six-year statute of limitations.

As to the district court's NEPA ruling, we lack jurisdiction to review the district court's order remanding the matter to the Forest Service for an EIS and decline to vacate the injunction.

_____