# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PIT RIVER TRIBE; NATIVE
COALITION FOR MEDICINE LAKE
HIGHLANDS DEFENSE; MOUNT
SHASTA BIOREGIONAL ECOLOGY
CENTER,
     *Plaintiffs-Appellants,*

     v.

UNITED STATES FOREST SERVICE;
ADVISORY COUNCIL ON HISTORIC
PRESERVATION; CALPINE
CORPORATION; UNITED STATES
DEPARTMENT OF THE INTERIOR,
Bureau of Land Management,
     *Defendants-Appellees.*

No. 09-15385

D.C. No.
2:02-cv-01314-
JAM-JFM

OPINION

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted
March 10, 2010—San Francisco, California

Filed August 2, 2010

Before: J. Clifford Wallace, Sidney R. Thomas, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wallace

11045

**COUNSEL**

Deborah A. Sivas, Esq., and James R. Williams, Environmental Law Clinic, Mills Legal Clinic at Stanford Law School, Stanford, California, for plaintiffs-appellants Pit River Tribe, et al.

Mary Gabrielle Sprague, Esq., Appellate Section, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendants-appellees Bureau of Land Management, United States Department of the Interior, United States Forest Service, and Advisory Council on Historic Preservation.

John A. Bryson, Esq., Holland & Hart LLP, Washington, D.C., for defendant-appellee Calpine Corporation.

---

**OPINION**

WALLACE, Senior Circuit Judge:

This appeal arises out of an action by the Pit River Tribe, the Native Coalition For Medicine Lake Highlands Defense, and Mount Shasta Bioregional Ecology Center (collectively Pit River) against the Bureau of Land Management (BLM), the United States Forest Service, the Advisory Council on Historic Preservation, and the Department of the Interior (collectively agencies), and against Calpine Corporation (Calpine). This case has already resulted in one appeal to this court, *Pit River Tribe v. United States Forest Service*, 469 F.3d 768, 772 (9th Cir. 2006) (*Pit River I*).

A detailed factual history of this case is provided in *Pit River I. Id.* at 772-78. We will reiterate that factual history only briefly here. The underlying litigation concerns Calpine's efforts to develop a geothermal power plant near Medi-

cine Lake, an area of spiritual significance to the Pit River Tribe and other Native American tribes in the region. In June 1988, pursuant to the Geothermal Steam Act, 30 U.S.C. § 1001 *et seq*., the BLM entered into two geothermal leases for land in the Medicine Lake area with Calpine's predecessor. The leases provided for an initial term of ten years and "granted the lessee the exclusive right to drill for, extract, produce, remove, utilize, sell, and dispose of the geothermal resources" in the land, subject to certain stipulations and to applicable law. 469 F.3d at 775-76. In 1995, after preliminary exploration, Calpine submitted to the agencies a plan of utilization for the proposed power plant at issue in this litigation: the Fourmile Hill Geothermal Development Project (the Fourmile Hill Plant). *Id*. at 776. In May 1998, the BLM extended Calpine's leases for five years, pursuant to a then-operative regulation, 43 C.F.R. § 3203.1-4(c) (1998), which allowed a five-year extension of such a lease if the lessee met certain diligence requirements. *Pit River I*, 469 F.3d at 777. In September 1998, the agencies issued a final Environmental Impact Statement (EIS) for the Fourmile Hill Plant, *id*.; and, in May 2000, issued a Record of Decision (ROD) approving the plant, *id*. at 777-78. In 2002, the BLM extended Calpine's leases for another 40 years. *Id*. at 778. In granting this 40-year extension, the BLM relied on a regulation, 43 C.F.R. § 3203.1-3 (1998), which allowed such an extension if the lease was producing geothermal resources in "commercial quantities." *Id*. Thereafter, Pit River sued the agencies and Calpine in the United States District Court for the Eastern District of California, alleging that the agencies had violated various federal laws during the leasing and development process. *Id*. The district court entered summary judgment for the agencies and Calpine, and Pit River appealed. *Id*.

In *Pit River I*, we reversed the district court's summary judgment. We held, in part, that the agencies should have prepared an EIS *prior to* granting the May 1998 lease extensions. We determined, furthermore, that this error was not cured by the later, September 1998 EIS completed in connection with

the Fourmile Hill Plant approval process. *Id.* at 785-86. We held that the 1998 lease extensions "and the entire Fourmile Hill Plant approval process for development of the invalid lease rights" violated the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA). *Id.* at 787. We also held that these NEPA and NHPA violations constituted a violation of the agencies' "minimum fiduciary duty to the Pit River Tribe." *Id.* at 788. We concluded:

> The agencies violated their duties under NEPA and NHPA and their fiduciary duty to the Pit River Tribe by failing to complete an environmental impact statement before extending Calpine's leases in 1998. Hence, both the five-year lease extensions and the subsequent forty-year extensions must be undone. The rest of the project approval process, including the 1998 EIS, was premised on Calpine's possession of a valid right to develop the land and therefore must be set aside. . . . We reverse the district court's summary judgment in favor of the agencies, and direct the district court to enter summary judgment in favor of Pit River consistent with this opinion.

*Id.*

On remand to the district court, the parties disputed the proper course to be followed. The agencies, joined by Calpine, argued that they need only reconsider the 1998 lease extensions and any subsequent decisions (*e.g.* the approval of the Fourmile Hill Plant and the 40-year lease extensions granted in 2002). Pit River argued that, because the original 1988 leases had expired by their terms, Calpine had no present lease rights remaining. Pit River argued that the leasing process must therefore begin from scratch, with the agencies treating Calpine as seeking a new initial lease. This would entail, among other things, a competitive bidding process. *See* 30 U.S.C. § 1003.

After considering the parties' submissions, the district court entered summary judgment in favor of Pit River on the relevant claims. In its memorandum of decision, the district court considered, however, that the "court of appeals . . . . left this [c]ourt to specify terms of judgment that would satisfy the mandate." In its order remanding the case to the agencies, the district court enjoined Calpine from engaging in any surface-disturbing activity pending proper NEPA and NHPA analysis and documentation. The district court also ordered the agencies to vacate the 1998 and 2002 lease extensions and the ROD approving the Fourmile Hill Plant. The district court remanded to the relevant agencies with instructions for the agencies to perform the proper NEPA and NHPA reviews, to conduct further consultation with Native American Tribes, and to prepare proper EIS documents regarding the lease extensions and the Fourmile Hill Plant plan of utilization.

The district court disagreed with Pit River's contention that the leasing process must begin anew. Reasoning that a "mere finding of a NEPA violation does not automatically and retroactively invalidate anything," the district court determined that it had discretion to preserve the lease extensions even if they were issued in violation of NEPA. The district court then determined that "the 1998 lease extension . . . took effect and the 1988 leases did not expire." The district court concluded that the agencies need not "withdraw the 1988 leasing decisions," but that the "BLM shall have absolute discretion to void or cancel the leases, deny lease extensions or unit commitment, and add or modify lease conditions." Pit River now appeals.

## I.

We first must assure ourselves that we have jurisdiction to hear this appeal. We must determine whether we can properly exercise jurisdiction pursuant to 28 U.S.C. § 1291 or 1292(a), or, in the alternative, whether we have jurisdiction over this appeal pursuant to the All Writs Act, 28 U.S.C. § 1651(a).

## A.

The parties assert that appellate jurisdiction is appropriate under 28 U.S.C. § 1291. In this case, the district court entered summary judgment in favor of Pit River, pursuant to our order of remand. *See Pit River I*, 469 F.3d at 788. The district court then remanded this case to the relevant agencies for further proceedings, with instructions that the district court believed were necessary to effectuate the mandate of *Pit River I*. We conclude that the district court's entry of summary judgment and remand order do not constitute a "final decision" by the district court, and therefore jurisdiction cannot lie pursuant to section 1291.

[1] Under section 1291, appellate jurisdiction extends only to "final decisions of the district courts." Importantly, remand orders are generally not "final" decisions for purposes of section 1291. *Chugach Alaska Corp. v. Lujan*, 915 F.2d 454, 457 (9th Cir. 1990). A district court's remand order may be considered final in certain circumstances, however:

> A remand order will be considered final where (1) the district court conclusively resolves a separable legal issue, (2) the remand order forces the agency to apply a potentially erroneous rule which may result in a wasted proceeding, and (3) review would, as a practical matter, be foreclosed if an immediate appeal were unavailable.

*Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1184 (9th Cir. 2004) (internal quotation marks and citation omitted); *see also Kaho v. Ilchert*, 765 F.2d 877, 880-81 (9th Cir. 1985); *Regents of Univ. of Cal. v. Heckler*, 771 F.2d 1182, 1186-87 (9th Cir. 1985) (*overruled on other grounds by Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993); *Stone v. Heckler*, 722 F.2d 464, 466-67 (9th Cir. 1983).

In *Alsea*, we discussed the circumstances in which a remand order may constitute an appealable final decision. In

that case, Alsea challenged a final rule promulgated by the National Marine Fisheries Service (Fisheries Service); the rule at issue pertained to the designation of certain salmon populations as "threatened" for purposes of the Endangered Species Act. *Id.* at 1183. The district court granted summary judgment to Alsea, and then remanded the case to the Fisheries Service for additional proceedings consistent with its decision. The district court directed the Fisheries Service to consider "the best available scientific information" on the issue presented. *Id.* The Fisheries Service agreed to comply with the court's directions and also announced that it would commence a comprehensive review of the policies at issue, including "a public rulemaking process to formulate [Endangered Species Act] listing standards for salmon . . . ." *Id.* The Oregon Natural Resources Council, fearing that the Service would not appeal the district court order, sought to intervene in the case as of right and simultaneously lodged a notice of appeal. *Id.* at 1184. The district court permitted the Oregon Natural Resources Council to intervene for purposes of appeal. *Id.*

**[2]** We concluded there that the district court's remand order did not constitute a final order appealable by the Oregon Natural Resources Council. We applied the three-part standard, set forth above, in making this determination. *Id.* We held that the remand order in *Alsea* failed to satisfy the third prerequisite, that "review would, as a practical matter, be foreclosed if an immediate appeal were unavailable." *Id.* (internal quotation marks omitted), *citing Collord v. United States Dep't of the Interior*, 154 F.3d 933, 935 (9th Cir. 1998). We explained that, generally, a remand order may be deemed a final order only where the *agency* appeals the remand: Because an agency cannot appeal its own decision, "only *agencies* compelled to refashion their own rules face the unique prospect of being deprived of review altogether." *Id.*

*Alsea* did not announce a hard-and-fast rule prohibiting a non-agency litigant from appealing a remand order. *See id.* at

1184 ("Although we conceive of none, there may be circumstances that would afford a non-agency litigant the ability to appeal a remand order, but we need not reach that question"). The Oregon Natural Resources Council, however, was not similarly-situated to an agency litigant. Instead, "no aspect of the district court's ruling [would] vitiate[ ] the Council's access to appellate review of the eventual outcome of the district court's decision." *Id.* at 1185. Indeed, we observed that "it [was] possible that the action taken by the Service on remand [would] provide the Council with all the relief it [was] seek[ing]." *Id.* Furthermore, the Oregon Natural Resources Council could participate during the public participation phase of the rulemaking process and would thereby have a chance to influence the formulation of new rules. *Id.* If the Council perceived the eventually resulting rule "to be unlawful and adverse to its interests," it could challenge the rule at that point. *Id.* But, we said that "[u]ntil all these contingencies have played out . . . any decision by us could prove entirely unnecessary." *Id.*

*Alsea*'s reasoning was echoed by the Eighth Circuit in *Izaak Walton League of America v. Kimbell*, 558 F.3d 751 (8th Cir. 2009). There, Wilderness Watch and several other organizations sued the United States Forest Service, alleging that its decision to construct a snowmobile trail was unlawful. *Id.* at 753. The district court entered summary judgment for the Forest Service on certain claims, but also determined that the environmental assessment prepared by the Forest Service for the trail project had been inadequate. As a result, the district court remanded the case to the agency, with instructions to prepare an EIS. *Id.* Certain intervenor parties appealed the portion of the district court's decision remanding to the Forest Service. The Eighth Circuit concluded that it had no jurisdiction to hear the appeal because the remand order was not a final decision. *Id.* at 762. Citing our decision in *Alsea*, the court observed that the *agency* might have been able to appeal the remand order. *Id.* at 763. But as the case stood, the remand order was not final.

While acknowledging that remand orders are generally not considered final for purposes of section 1291, Calpine argues here that the district court's remand order was effectively final because it "intended to dispose of the entire case." Calpine asserts that a remand order, accompanied by dismissal of the action, is the "equivalent of an order of dismissal" and appealable under section 1291. In support of its position, Calpine cites our decisions in *City of Santa Clara v. Andrus*, 572 F.2d 660 (9th Cir. 1978) and *Eluska v. Andrus*, 587 F.2d 996 (9th Cir. 1978).

**[3]** In this case, it is true that the district court ordered that any judicial action following remand "will be commenced by filing a new complaint initiating a new federal district court case." The reasoning of *Alsea* remains persuasive, however. Similar to the appellant in *Alsea*, Pit River will have an opportunity to participate in the agencies' processes on remand. Indeed, it is possible that the agencies may decide that no geothermal power production should occur on the land and decline to extend Calpine's leases. As in *Alsea*, any decision by this court may prove entirely unnecessary. *See Alsea*, 358 F.3d at 1185. As it stands now, the remand order is not a final order appealable under section 1291.

The authorities cited by Calpine, *City of Santa Clara* and *Eluska*, do not persuade us otherwise. *City of Santa Clara* is distinguishable. In that case, both the plaintiff *and* the relevant agency sought review of the district court's remand order. 572 F.2d at 663. *City of Santa Clara* therefore falls within the exception discussed in *Alsea*, which permits an agency's appeal of a remand order where the agency will otherwise be effectively foreclosed from appealing post-remand.

*Eluska* also does not establish the propriety of our jurisdiction in this case. Calpine cites *Eluska* as establishing the proposition that, where a district court intends to dispose of an entire case, a remand order is equivalent to an order of dismissal. We do not read *Eluska* as Calpine urges. In *Eluska*,

the plaintiff applied for a land allotment pursuant to relevant federal law. After denial of her claim, the plaintiff sued the Secretary of the Interior, alleging that the agency wrongfully denied her claim. 587 F.2d at 997-98. She asserted several claims, including a due process right to a hearing, and a challenge to the agency's application of a use-and-occupancy requirement. *Id.* The district court agreed that the plaintiff had a right to a hearing and remanded, *id.* at 998, but denied plaintiff's motion for summary judgment regarding the use-and-occupancy issue. We held that there was no appealable final order, observing that "[n]either a remand order nor a denial of summary judgment is ordinarily final and appealable." *Id.* at 999. Plaintiff argued that the use-and-occupancy requirement was being applied incorrectly by the agency, rendering remand for a hearing futile. We stated that "in order to conclude that the judgement was final, we must first find that it was equivalent to an order of dismissal." *Id.* There, the district court had not even dismissed the case, but instead had "wished to retain jurisdiction." *Id.* at 1000. The discussion in *Eluska* of the "equivalent to an order of dismissal" referred only to the fact that the district court had not even dismissed the case, but instead had retained jurisdiction. *Id.* at 999. We do not read *Eluska* as holding that a remand accompanied by dismissal of the action in district court is always and necessarily a final order.

**[4]** We therefore hold that, under the principles applied in *Alsea*, the remand order here was not a final order for purposes of section 1291. *See generally Alsea*, 358 F.3d at 1184.

## B.

**[5]** Taking a different tack, Calpine asserts that we may exercise jurisdiction over this appeal because the district court's remand order was the equivalent of an interlocutory order refusing an injunction. *See, e.g.*, *Plata v. Davis*, 329 F.3d 1101, 1106 (9th Cir. 2003) ("[A] line of cases . . . permit[s] appellate jurisdiction over orders that have the 'practi-

cal effect' of granting, denying, or modifying injunctive relief") (internal citations omitted). We have jurisdiction over appeals from interlocutory orders of the district courts "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions . . . ." 28 U.S.C. § 1292(a)(1). We have described section 1292(a)(1) as "a limited exception to the final-judgment rule," which should be construed "narrowly." *Alsea*, 358 F.3d at 1186. To be appealable under section 1292(a)(1), as having the "practical effect" of an injunction, the district court's order "must (1) have the practical effect of entering an injunction, (2) have serious, perhaps irreparable, consequences, and (3) be such that an immediate appeal is the only effective way to challenge it." *Calderon v. United States Dist. Court for the Cent. Dist. of Cal.*, 137 F.3d 1420, 1422 n.2 (9th Cir.1998); *see also Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981).

However, the district court's remand order was not tantamount to an order respecting an injunction for purposes of section 1292(a)(1). Calpine's argument fails because it is based on a misstatement of Pit River's position. Calpine's argument proceeds as follows: on remand to the district court following *Pit River I*, Pit River asked the district court to "set[ ] aside the geothermal leases issued in 1988," which relief "would have required BLM to cancel those leases and therefore would have constituted" injunctive relief. Calpine misconstrues Pit River's argument, because Pit River did not request the cancellation or invalidation of the original 1988 leases. Instead, Pit River's position was that the original 1988 leases had expired *by their own terms*; that is, the leases had terminated in 1998 upon expiration of their 10-year terms. Pit River did not ask the district court to issue an injunction or the equivalent of an injunction. *See, e.g.*, Black's Law Dictionary (8th ed. 2004) (defining "injunction" as "[a] court order commanding or preventing an action"). Pit River simply asserted that, on remand proceedings before the agency, the original 1988 leases could not be extended as a matter of law, such that Calpine could receive only an entirely new lease.

**[6]** Here again, the *Alsea* case is instructive. There, we rejected a party's assertion that a remand order had the " 'practical effect' of granting an injunction." *Alsea*, 358 F.3d at 1186. In *Alsea*, the district court had declared an agency listing under the Endangered Species Act unlawful and set the listing aside. We concluded that the district court's order was not equivalent to an injunction because it did not compel the relevant agency to take or refrain from any action. We explained that:

> the only aspect of the summary judgment that remotely resembles injunctive relief is that it prohibits, as a practical matter, the enforcement of the Service's listing decision as is. It would be far too tenuous, however, to maintain that this is the practical equivalent of "enjoining" the Service. Taken to its logical end, such reasoning would classify as "injunctive" all declaratory relief that deems an agency rule unlawful.

*Alsea*, 358 F.3d at 1186. Similarly, the remand order at issue here cannot be construed as an order granting or denying an injunction; therefore, we lack appellate jurisdiction pursuant to section 1292(a)(1).

## C.

**[7]** The agencies and Calpine argue, in the alternative, that we are given jurisdiction to hear this appeal by the All Writs Act, 28 U.S.C. § 1651(a). The All Writs Act, section 1651(a), provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." Of relevance here, the "writ of mandamus has traditionally been used . . . 'to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so.' " *Will v. United*

*States*, 389 U.S. 90, 95 (1967), *quoting Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943).

**[8]** In *Vizcaino v. United States District Court*, we stated that "when a lower court obstructs the mandate of an appellate court, mandamus is the appropriate remedy. . . ." 173 F.3d 713, 718-19 (9th Cir. 1999). We stated that mandamus is justified to protect "the supervisory role of the courts of appeals within the federal judicial system," and because "litigants who have proceeded to judgment in higher courts should not be required to go through that entire process again . . . ." *Id.* at 719 (internal citations and quotation marks omitted). We said, further:

> Mandamus to compel an inferior court to follow an appellate mandate is closely related to the doctrine of law of the case. The Supreme Court long ago emphasized that when acting under an appellate court's mandate, an inferior court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate. . . . On remand, a trial court can only consider any issue not expressly or impliedly disposed of on appeal. . . . District courts must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.

*Id.* (internal quotation marks and citations omitted).

**[9]** Although Pit River does not style its appeal as a request for a writ of mandamus, we may construe an appeal as a petition for a writ of mandamus to compel compliance with an earlier appellate decision. *See Brown v. Baden*, 815 F.2d 575, 576 (9th Cir. 1987). So construed, we next determine whether we may examine the district court's remand order pursuant to *Vizcaino* and other relevant authority. In this regard, the essence of Pit River's appeal is that the district court's entry of summary judgment and order remanding to the agencies

violated our mandate as contained in our *Pit River I* opinion. *Vizcaino* would recognize jurisdiction pursuant to the All Writs Act to consider whether the district court's orders implemented the letter and spirit of our *Pit River I* mandate.

We acknowledge a different line of cases that authorizes the issuance of a writ of mandamus under the All Writs Act in "extraordinary cases." To determine whether this case is "extraordinary," we have considered five questions, known as the *Bauman* factors:

> (1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems or issues of first impression.

*Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010), *citing Bauman v. United States District Court*, 557 F.2d 650, 645-55 (9th Cir. 1977). As we have said, not all factors need be met. *Cole v. United States District Court*, 366 F.3d 813, 817 (9th Cir. 2004) ("Evidence showing that all the *Bauman* factors are affirmatively presented by a case does not necessarily mandate the issuance of a writ, nor does a showing of less than all, indeed of only one, necessarily mandate denial; instead, the decision whether to issue the writ is within the discretion of the court."). *Bauman* provides a framework for analysis, but the factors should not be mechanically applied. *Id.*

**[10]** *Vizcaino* stated that reliance on the *Bauman* factors is "misplaced" where "mandamus is sought on the ground that the district court failed to follow the appellate court's man-

date." *Vizcaino*, 173 F.3d at 719.[1] Here, it appears that this case would meet the requirements of *Vizcaino* and *Bauman*.

## II.

Moving to the merits of the case, we review de novo the district court's compliance with the mandate of our court. *United States v. Kellington*, 217 F.3d 1084, 1092 (9th Cir. 2000). We review for an abuse of discretion the district court's equitable orders. *United States v. Washington*, 157 F.3d 630, 642 (9th Cir. 1998). Because questions of law are reviewed de novo, a district court "abuses its discretion when its equitable decision is based on an error of law." *Id.* We must determine whether the district court's order interfered with an issue that was "expressly or impliedly disposed of on appeal" in *Pit River I*, and whether the district court's order "implement[ed] both the letter and the spirit of the mandate, taking into account the [*Pit River I*] opinion and the circumstances it embraces." *Vizcaino*, 173 F.3d at 719 (internal quotation marks and citation omitted).

## A.

Pit River first argues that Calpine's leases are not capable of extension as a matter of law and that the district court erred by leaving open the possibility that Calpine's leases could be extended by the agencies on remand. Pit River argues: (1) the

---

[1]Relying solely on the circumstance that two of our cases subsequent to our *Bauman* opinion asserted mandamus jurisdiction over challenges to whether the district court followed our remand order without specifically citing *Bauman*, *Vizcaino* took the position that *Bauman* did not apply to mandamus petitioners dealing with whether the district court followed an appellate court mandate. *Vizcaino*, 173 F.3d at 719. Nothing in *Bauman* allows for this exception and indeed it has not even been alluded to in the subsequent 22 years after we filed *Bauman* until *Vizcaino*. *Vizcaino's* disagreement with the *Bauman* factors respected whether those factors were necessary and appropriate to apply to a situation where the complaint on appeal was a district court's noncompliance with an appellate mandate.

original 1988 leases expired in 1998, pursuant to their express terms and pursuant to Congress's policy decision that the initial term of a geothermal lease should be ten years, *see* 30 U.S.C. § 1005(a), and (2) *Pit River I* directed that the extensions "must be undone." Based on these considerations, Pit River argues that Calpine has no present lease rights, under either the original 1988 leases or any extensions. According to Pit River, even if the agencies fulfill their obligations on remand and determine that lease extensions are appropriate, the leases have expired according to their terms and, as a matter of law, cannot be extended. As a necessary consequence, Pit River asserts, Calpine must start the leasing process from scratch. We now take up these issues.

## 1.

[11] We first address Pit River's argument that the leasing process must begin anew. As set forth above, Pit River argues that the original leases have expired and the leasing process must start over. We cannot accept Pit River's argument. By this logic, any successful challenge to a lease *extension* could undo an entire lease relationship. A litigant could, by challenging a lease extension alone, force a lessee into a de novo leasing process, including competitive bidding. Pit River's argument would render superfluous the statute of limitations for challenging an initial lease decision. In *Pit River I*, however, we held that the statute of limitations had run on any challenge to the original 1988 leases. 469 F.3d at 781. If we were to accept Pit River's argument, a litigant who was time-barred from challenging an initial lease could attain the same result, stripping a lessee of *all* contractual rights, simply by mounting a successful challenge to the most recent lease *extension*. In light of these considerations, we hold that a successful challenge to a lease extension results only in the undoing of the extension. The agency may properly reconsider its decision to extend the leases. This is the course of action we contemplated in *Pit River I*, wherein we stated that the *extensions* "must be undone" and the decisions that followed them

"must be set aside." *Id*. at 788. In this case, we conclude that Pit River's challenge to extension of Calpine's leases requires reconsideration of the *extensions*, not a de novo leasing process.

A consideration of the relief commonly awarded for NEPA violations lends further support to this course of action. Our courts have long held that relief for a NEPA violation is subject to equity principles. For example, in *Conner v. Burford*, we held that certain gas leases need not be invalidated, even though those leases had been sold in violation of NEPA. 848 F.2d 1441, 1461 (9th Cir. 1988). Rather, we held that it was sufficient to enjoin "any surface-disturbing activity to occur on any of the leases until they have fully complied with NEPA" and to instruct that "future environmental analysis by the federal agencies shall *not* take into consideration the commitments embodied in the . . . leases already sold." *Id*.; *see also N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 842 (9th Cir. 2007) ("a NEPA violation is subject to traditional standards in equity for injunctive relief and does not require an automatic blanket injunction against all development"); *Oregon Natural Res. Council v. B.L.M.*, 470 F.3d 818, 823 (9th Cir. 2006) (holding the BLM's environmental assessment of a project was inadequate, and instructing the district court "to enjoin the remainder of the . . . project until the BLM provides a revised Environmental Assessment, including the required hard look at cumulative impacts of the logging already completed on contiguous habitat areas or neighboring habitat areas to be impacted by contemplated future sales").

Similarly, in *Sierra Club v. Bosworth*, we considered the appropriate relief for an agency's failure to make a reasoned decision. 510 F.3d 1016, 1033 (9th Cir. 2007). In that case, we held that an agency failed to show it made a reasoned decision to promulgate a "categorical exclusion" for certain projects. *Id*. at 1018. As to relief, we observed that "the public interest favor[s] issuance of an injunction because allowing a potentially environmentally damaging program to proceed

without an adequate record of decision runs contrary to the mandate of NEPA." *Id.* at 1033. Nevertheless, in balancing the hardships, we "recognize[d] that the challenged [categorical exclusion] was promulgated in 2003 and many individual projects already have been approved and are in operational stages." *Id.* at 1034. In light of these countervailing interests, therefore, we remanded to the district court "with instructions to enter an injunction precluding the Forest Service from implementing the [categorical exclusion] pending its completion of an adequate assessment." *Id.* However, we ordered the injunction to "be limited to those projects for which the Forest Service did not issue approval prior to the initiation of this lawsuit," and left to the district court's discretion "the decision as to which projects approved after the lawsuit was filed are appropriate to exclude from the injunction because they are at or near completion." *Id.*

**[12]** As these cases demonstrate, here the district court had discretion to determine an appropriate remedy for the agencies' NEPA violations. The district court's remand order sought to approximate what would have happened had the agencies used the proper procedures in 1998. That is, Calpine would have been awaiting the agencies' decision, based on a valid EIS, as to whether to extend the leases. Calpine would not have faced a full competitive bidding process. This is consistent with both the letter and the spirit of our directive in *Pit River I*. The district court's remand order requires that the agencies' decisions to extend Calpine's leases be "undone," void, as if they never happened. On remand, the agencies will now reconsider the relevant decisions, with a proper record and with proper environmental assessments. Contrary to Pit River's assertion, the district court did not "reinstate" the original 1988 leases. The original 1988 leases are merely deemed capable of extension on remand. Accordingly, the district court did not abuse its equitable powers in ordering that the original 1988 leases be treated as capable of extension. Instead, the district court placed the parties as closely as possible to where they would and should have been in 1998:

Calpine seeks extensions of its leases, and the agencies must now properly act on that request.

**2.**

Pit River asserts that our *Pit River I* decision contemplated that Calpine would possess no present rights in the leases. Pit River points to the following passage in *Pit River I*:

> Without the affirmative re-extension of the 1988 leases, Calpine would have retained no rights at all to the leased property and would not have been able to go forward with the Fourmile Hill Plant. The status quo before the 1998 extensions was that Calpine owned rights to produce geothermal steam valid through May 31, 1998, after which Calpine owned nothing.

469 F.3d at 784. Pit River argues that this statement shows that Calpine must seek an entirely new lease.

[13] The above-quoted statement must be put in context. In *Pit River I*, the agencies urged that the 1998 lease extensions merely preserved the status quo and did not require a separate EIS. *See id.*; *cf. also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1344 (9th Cir. 1995) (*"Discretionary agency action that does not alter the status quo* does not require an EIS."); *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1114 (9th Cir. 2002) (" 'an EIS is not required in order to leave nature alone' ") (citation omitted). We did not agree with the agencies' contention that the 1998 lease extensions preserved the status quo, because extension of the 1988 leases was not a mere continuation of use. *Compare Pit River I*, 469 F.3d at 784, *with Espy*, 45 F.3d at 1343-44. We described the situation as follows: "Instead of preserving the status quo, the lease extensions gave Calpine an extra five years to develop the land and the possibility of obtaining a future lease extension of up to forty years." *Pit River I*, 469 F.3d at 784. Pit

River relies, therefore, on a statement made in the context of our ruling that the 1998 extensions required an EIS because they did not merely preserve the status quo. *Id.* We were not explaining what result would follow from an invalidation of the lease extensions on appeal.

Pit River also argues that evaluation of the lease extensions alone will provide insufficient relief, if any at all. Pit River argues that the agency process will be tainted by the momentum the project has gained since 1998 and by the agencies' longstanding relationship with Calpine. If the agencies reconsider only the lease extensions, Pit River argues the agencies will be tempted to respect their prior commitments. Pit River argues that this case is similar to *Metcalf v. Daley*, in which we warned that a prior relationship between an agency and a group might taint the agency process. 214 F.3d 1135, 1144 (9th Cir. 2000). There, the Makah Tribe wished to recommence whaling; the relevant agency had made a written commitment to the Makah and taken "concrete efforts on their behalf." *Id.* We expressed concern that, under these circumstances, an environmental assessment might be biased in favor of the Makah's interests. *Id.*

While bureaucratic inertia may be a risk, we presume that agencies will follow the law. *See N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988) ("Bureaucratic rationalization and bureaucratic momentum are real dangers, to be anticipated and avoided by the Secretary. . . . We assume the Secretary will comply with the law"). Unlike the agency in *Metcalf*, 214 F.3d at 1144, the agencies here have not made a commitment to support Calpine's objectives. Moreover, what "commitments" the agencies have made — in the form of the 1998 and 2002 lease extensions and the Fourmile Hill Plant approval — have been undone. The agencies are therefore in a position to take a "hard look" at these commitments anew. There is indubitably some risk that the agencies may feel pressure to extend the leases, due to their dealings with Calpine over several decades. But these pressures are no

greater than those inherent in *any* decision where the agency already has a history of dealings with the counterparty, such as a lessee.

**[14]** Seeking to bolster this argument, Pit River asserts that the district court remand order created "new property rights" in Calpine, which "resurrects the specter of a constitutional taking[s] claim" in the event that the agencies deny the lease extensions. Pit River argues that the remand order gives Calpine a "credible litigation threat" to pursue claims for takings or breach of contract, which will "cast[ ] a significant pall over the objectivity of the remand process." Any possible claims by Calpine are not before us, and are in any case unripe. We will not opine on the merits of such speculative claims. We reiterate and will instruct the district court on remand, however, to clarify that the 1998 extensions and all subsequent decisions did not "take effect," but rather are simply deemed *capable* of extension.

**3.**

Pit River alternatively argues that, if the status of Calpine's leases was not resolved by operation of law and by *Pit River I*, their status should be determined by the agencies in the first instance, and on a proper administrative record. To accept Pit River's argument in this regard, we must first accept Pit River's characterization of the district court's remand order as a decision to "reinstate" the original 1988 leases. As explained above, the original 1988 leases have not been and need not be reinstated. Rather, they are deemed to be capable of extension under proper circumstances and need only be deemed capable of extension upon remand to the agencies.

In light of our holding that the district court did not err in treating the original 1988 leases as capable of extension on remand, we need not reach the argument advanced by Calpine and the agencies that a provision of the Administrative Procedure Act, 5 U.S.C. § 558(c), renders the original 1988 leases

operational until a valid extension decision is made on remand.

The district court's reasoning was incorrect on one point. The district court construed *Pit River I* as vesting it with the option of *either* invalidating the leases as of 1998 *or* enjoining any surface-disturbing activity pending remand to the agency. The district court considered that

> The court of appeals decision makes clear that the mere finding of a NEPA violation does not automatically and retroactively invalidate anything. The two alternative remedies identified by the court of appeals which would ensure full compliance were: (1) invalidating the leases as of 1998 thus nullifying the 2002 extensions; or (2) enjoining any surface-disturbing activity until the agencies comply fully with NEPA and other statutes. [*Pit River I*,] 469 F.3d at 779.

The district court chose the latter course of action, enjoining surface-disturbing activity, holding that "despite noncompliance, the 1998 lease extension in this case took effect and the 1988 leases did not expire."

This was error. The district court relied on language from our *Pit River I* opinion concerning *standing*, that is, whether Pit River's claimed injuries were redressable for purpose of standing. On the issue of *relief*, our opinion in *Pit River I* was clear that the 1998 and 2002 lease extensions "must be undone" and the subsequent decisions "premised on Calpine's possession of a valid right to develop the land" be "set aside." 469 F.3d at 788. Thus, the district court was incorrect to the extent that it held that "the 1998 lease extension in this case took effect." As a practical matter, this error is harmless because the district court's order directed the lease extensions to be vacated, but for the avoidance of doubt, we order the district court to clarify on remand that the 1998 extensions did

not take effect; rather, the original 1988-1998 leases are simply deemed capable of extension.

**B.**

Pit River also argues that the district court erred in prescribing "*ad hoc* procedures" for the BLM's reconsideration of the extensions. As discussed above, courts have discretion to formulate equitable relief to remedy a NEPA violation. We conclude that the district court properly gave guidance to the agencies on how to reconcile the *Pit River I* mandate with certain post-1998 changes in the law of geothermal leases.

The Geothermal Steam Act was amended in 2005 to provide (among other things) that lease extensions were mandatory, not discretionary, so long as the lessee met certain conditions unrelated to NEPA or NHPA obligations. *Pit River I*, 469 F.3d at 780. The BLM subsequently issued "transition rules" explaining how the 2005 amendments would impact leases issued before August 8, 2005. *Id.* at 781. The transition rules, which were issued after our decision in *Pit River I*, provide that a lessee of a lease issued before August 8, 2005 "may elect to be subject to" the new regulations, if they made such an election by December 1, 2008. 43 C.F.R. § 3200.7. Calpine submitted such an election. Thus, under the amended regulations, the BLM would be obliged to grant Calpine's extension without regard to NEPA or NHPA review.

A mandatory extension, however, would clearly be counter to our mandate in *Pit River I*. To avoid that result, the district court ordered that on remand:

> Notwithstanding amendments to the Geothermal Steam Act and its implementing regulations, and regardless of whether Calpine elects to subject the leases to the new regulations, BLM shall have absolute discretion to void or cancel the leases, deny lease extensions or unit commitment, and add or

modify lease conditions; BLM shall have absolute discretion to deny, approve, or modify the plan of utilization [for the Fourmile Hill Plant]; and the Forest Service shall have absolute discretion to deny, approve, or modify proposed surface use or development on National Forest System lands affected by the leases. In the event Calpine elects to subject the Fourmile Leases to the new regulations, BLM shall issue a decision suspending application of the election as it pertains to the term of the leases pending and conditioned upon the analysis required under Paragraph 9.

Paragraph 9, in turn, stated that notwithstanding the statutory amendments and Calpine's election, the agencies must prepare an EIS which must "include a 'no action' alternative and a 'hard look' at whether lands affected by the leases should be developed for energy at all."

[15] These instructions represent a reasonable exercise of the district court's equitable powers to resolve the potential conflict between the current regulations and our mandate in *Pit River I*. Our directive in *Pit River I*, and the district court's task on remand, was to require the agencies to do now what they should have done in 1998. If in 1998, after compliance with NEPA and NHPA, the Calpine leases had been validly extended, Calpine would eventually have been given the option to make an election to have its pre-2005 leases governed by the new regulations. The district court's remand order has specified that any such election will not interfere with a "hard look" at the 1998 extension and subsequent decisions, but also ensured that should those decisions survive further agency scrutiny, Calpine's election will be operative thereafter.

## C.

Pit River argues that the district court's remand order is internally inconsistent. Pit River points out that a passage of

the district court's remand order provides that the "BLM shall have absolute discretion to void or cancel the leases, deny lease extensions or unit commitment, and add or modify lease conditions" and "to deny, approve, or modify the plan of utilization." Another provision of the district court's remand order "directs the BLM to issue a decision that 'reserves absolute right to deny lease extensions, *until* commitment, and/or development of the leases.' " In geothermal leasing, "unit commitment" refers to regulations that allow lessees in a geographic area to "commit" multiple leases to a "unit agreement," pursuant to which separately owned interests in geothermal resources may be treated as a single consolidated unit for certain purposes. *See* 43 C.F.R. §§ 3280.1, 3280.2, 3281.9(b). In 2002, Calpine committed several leases, including the two at issue here, to a unit agreement. Pit River thus argues that the district court order only gives the BLM the power to deny lease extensions "until commitment," and because commitment has already happened, the BLM will not be able to deny the extensions.

Pit River's fear is misplaced for two reasons. First, the 2002 unit commitment of the two leases occurred after the faulty 1998 extension decision, and is thus governed by *Pit River I*'s directive that "[t]he rest of the project approval process . . . was premised on Calpine's possession of a valid right to develop the land and therefore must be set aside." 469 F.3d at 788. Second, both the agencies and Calpine have represented in their briefs that the word "until," as it appears in the above-quoted passage from the district court's remand order, is a typographical error that was intended to read "unit." For the avoidance of doubt, we order the district court to correct this typographical error on remand; once it is corrected, the apparent contradiction in the order will be remedied.

## III.

[16] In conclusion, we substantially uphold the district court's remand; and we remand with instructions to correct

(1) the statement that "the 1998 lease extension in this case took effect and the 1988 leases did not expire" as explained in Part II.A of this opinion, and (2) the typographical error using the word "until" instead of the word "unit," as explained in Part II.C of this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS AND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**